# United States Court of Appeals
## For the First Circuit

No. 00-2492

MARY ANNE MCGUIRE ET AL.,

Plaintiffs, Appellees,

v.

THOMAS F. REILLY, ETC., ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Lynch, Circuit Judge.

Patricia Correa, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General of Massachusetts, Adam Simms and Elizabeth Frumkin, Assistant Attorneys General, were on brief, for appellants.
Jennifer C. Jaff, Killian, Donohue & Shipman, LLC, and Lucinda M. Finley on consolidated brief for Conn. Women's Education and Legal Fund, National Abortion Federation, NOW Legal Defense and Education Fund, Feminist Majority Foundation, Voters for Choice, American Jewish Congress, Conn. NARAL, Conn. Chapter of NOW, National Center for the Pro-Choice Majority, and Women's Law Project, amici curiae.
Carter G. Phillips, Paul E. Kalb, Jennifer M. Rubin, and

Sidley & Austin on brief for American College of Obstetricians and Gynecologists, Mass. Medical Society, and American Medical Ass'n, amici curiae.

Cynthia Stone Creem and Sean J. Kealy on brief for Senator Cynthia Stone Creem, Co-Chair, Joint Comm. on Criminal Justice (Mass. Senate), amicus curiae.

Richard Blumenthal, Attorney General of Connecticut, Eliot D. Prescott and Jane R. Rosenberg, Assistant Attorneys General, on brief for States of Connecticut, Colorado, Maryland, Nevada, and New York, amici curiae.

Paul E. Nemser, U. Gwyn Williams, Ketanji Brown Jackson, and Goodwin Procter LLP on brief for Women's Bar Ass'n of Mass., Abortion Access Project of Mass., AIDS Project of Worcester, Alternative Medical Care of Mass., American Ass'n of Univ. Women-Mass., Big Sister Ass'n of Greater Boston, Boston Women's Health Book Collective, Everywoman's Center, Four Women, Inc., League of Women Voters of Mass., Mass. NARAL, Mass. Chapter of NOW, Mass. Public Health Ass'n, National Council of Jewish Women-Mass., Religious Coalition for Reproductive Choice, Tapestry Health Systems, Union of American Hebrew Congregations-Northeast Council, Womancare/Repro Associates, and YWCA of Cambridge, amici curiae.

Mark L. Rienzi, with whom Thomas M. Harvey and Dwight G. Duncan were on brief, for appellees.

Maryclare Flynn on brief for Mass. Citizens for Life, Inc., amicus curiae.

Vincent P. McCarthy, American Center for Law and Justice Northeast, Inc., on brief for Family Research Council and Focus on the Family, amici curiae.

---

August 13, 2001

---

**SELYA, Circuit Judge.** This appeal — in which we have the benefit of exemplary briefing by the parties and the various amici — requires us to reconcile a triad of state interests (protecting public health, maintaining public safety, and preserving access to medical facilities) with the First Amendment interests of those who challenge restrictions on how they may debate issues of public concern. We act in the context of a Massachusetts statute, Mass. Gen. Laws ch. 266, § 120E½ (the Act), which creates a floating six-foot buffer zone around pedestrians and motor vehicles as they approach reproductive health care facilities (RHCFs). We view that statute through the prism of Hill v. Colorado, 530 U.S. 703 (2000), in which the United States Supreme Court upheld an analogous statute despite the fact that it incidentally restricted some speech.

The district court found meaningful distinctions between the Act and the Colorado statute at issue in Hill, determined that these distinctions undermined the constitutionality of the Act, and preliminarily enjoined the Act's enforcement. See McGuire v. Reilly, 122 F. Supp. 2d 97, 101-03 (D. Mass. 2000). But the distinctions noted by the district court do not make a dispositive difference. Hill controls, and the Act, on its face, lawfully regulates the time, place, and manner of speech without discriminating based on

-3-

content or viewpoint. Accordingly, we reverse the district court's ukase.

## I. BACKGROUND

In order to frame the issues on appeal, we think it is useful to trace the developments leading to the Act's passage, survey its text, and place it in the context suggested by the Hill Court's decision. With that foundation in place, we then recount the proceedings below.

### A. **The Act's History**.

By the late 1990s, Massachusetts had experienced repeated incidents of violence and aggressive behavior outside RHCFs. Concerned legislators responded to these disturbances by introducing Senate Bill No. 148, see S.B. 148, 181st Gen. Ct., Reg. Sess. (Mass. Jan. 6, 1999), reprinted in Appendix B hereto. The bill purposed to create a fixed twenty-five foot buffer zone from RHCFs' entrances, exits, and driveways, and with limited exceptions, to prohibit all persons from entering, or remaining within, that buffer zone regardless of the person's intent or the willingness of others to listen. The state senate held a hearing in April of 1999. The received testimony chronicled the harassment and intimidation that typically occurred outside

RHCFs. In addition, numerous witnesses addressed the emotional and physical vulnerability of women seeking to avail themselves of abortion services, and gave accounts of the deleterious effects of overly aggressive demonstrations on patients and providers alike. Based in part on this testimony, the senate concluded that existing laws did not adequately protect public safety in areas surrounding RHCFs. To remedy this situation, the senate favored the creation of fixed buffer zones. The sponsors of the bill left no doubt that they intended the proposed law to "increase public safety in and around [RHCFs]" while "maintain[ing] the flow of traffic and prevent[ing] congestion" there. S.B. 148, supra, § 1. In the bargain, the sponsors expected the law to provide "reasonable time, place and manner restrictions to reconcile and protect both the First Amendment rights of persons to express their views near reproductive health care facilities and the rights of persons seeking access to those facilities to be free from hindrance, harassment, intimidation and harm." It thereby would "create an environment in and around reproductive health care facilities which is conducive towards the provision of safe and effective medical services . . . to its patients." Id.

Skeptics worried that the proposed law might offend the Constitution. To stave off these gloom-and-doom predictions,

the senate, on November 3, 1999, asked the Massachusetts Supreme Judicial Court (SJC) for an advisory opinion on the bill's constitutionality. On January 24, 2000, the SJC concluded that the Constitution presented no obstacle to enactment. Opinion of the Justices to the Senate, 430 Mass. 1205, 1211-12 (2000). The SJC advised that the bill, as framed, was unrelated to the content of protected expression. Id. at 1209. Moreover, the restrictions imposed had a rational basis in view of the heightened governmental interest that arises when "advocates of both sides of one of the nation's most divisive issues frequently meet within close proximity of each other in the areas immediately surrounding the State's clinics, in what can and often do become congested areas charged with anger." Id. at 1210.

After receiving this favorable review, the senate engrossed Senate Bill No. 148 on February 29, 2000. That version of the law never came to a vote in the house of representatives, mainly because the United States Supreme Court decided Hill on June 28, 2000. In that opinion, the Court upheld, as a content-neutral time, place, and manner restriction, a Colorado statute designed to ameliorate the same evils. 530 U.S. at 719-21. The Court's conclusion rested on three pillars:

-6-

> First, [the statute] is not a regulation of speech.  Rather, it is a regulation of the places where some speech may occur.  Second, it was not adopted because of disagreement with the message it conveys. . . .  Third, the State's interests in protecting access and privacy, and providing the police with clear  guidelines,  are  unrelated  to  the content of the demonstrators' speech.

Id. at 719-20 (internal quotation marks omitted).

Massachusetts decided to follow the trail that Colorado had blazed.  Consequently, the house of representatives struck the text of Senate Bill No. 148 and reformulated its language. The amended version — ultimately enacted and codified as section 120E½ — recast the proposed statute and, most notably, replaced the fixed buffer zones originally envisioned by the state senate with floating buffer zones of the type upheld in Hill.  The house engrossed the bill on July 28, 2000, and the senate concurred the next day.  On August 10, 2000, Governor Cellucci signed the Act into law.

## B.  The Act's Text.

The  Act,  formally  known  as  the  Massachusetts Reproductive  Health  Care  Facilities  Act,  is  reprinted  in Appendix A hereto.  The Act makes it unlawful, absent consent, "knowingly to approach [within six feet of a person or occupied motor vehicle] for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education

-7-

or counseling with such other person in the public way or sidewalk area within a radius of 18 feet from any entrance door or driveway to a reproductive health care facility." Mass. Gen. Laws ch. 266, § 120E½(b).

The statutory prohibition is not absolute. In the first place, the architecture of this floating buffer zone precludes speakers from <u>approaching</u> unconsenting listeners, but it neither prevents speakers from holding their ground nor requires them to retreat from passersby. In the second place, the Act's prophylaxis does not attach unless and until an RHCF opens for business and clearly demarcates the protected eighteen-foot zone. <u>Id.</u> § 120E½(c). Finally, the Act exempts persons entering or leaving an RHCF; persons using the streets to reach a destination other than the RHCF; and, while acting within the scope of their employment, (i) the RHCF's employees and agents, and (ii) certain government officials (e.g., police officers). <u>Id.</u> § 120E½(b).

## C. **The Influence of Hill**.

In rejecting a challenge to a similar Colorado statute, the <u>Hill</u> Court made a number of pronouncements that inform our resolution of this appeal. Perhaps most important, the Court held that the Colorado law was content-neutral even though it singled out "oral protest, education, [and] counseling," because

this denoted a broad category of speech rather than specifying a particular subject matter or viewpoint. 530 U.S. at 720. In reaching this conclusion, the Court gave short shrift to the argument that, by targeting health care facilities, the Colorado statute impermissibly discriminated against abortion protesters. Id. at 724.

Three other points deserve mention. First, the Court emphasized the significance of the state's interest in preserving access to health care facilities. Id. at 715. Second, the Court noted that the Colorado legislature had tailored the law narrowly to serve this end. Id. at 728-29. Third, the Court determined that a floating buffer zone of modest proportions left ample alternative channels for communication. Id. at 723.

Hill bears on this case in another way as well. Although the Act was conceived in the albedo of Hill, it is not a carbon copy of the statute at issue there. There are five key differences:

      C      The protections of the Colorado law apply to all health care facilities, Colo. Rev. Stat. § 18-9-122, whereas the Act applies only to free-standing clinics that provide abortions, Mass. Gen. Laws ch. 266, § 120E½.

      C      The Colorado statute specifies an 100-foot radius around all covered facilities, Colo. Rev. Stat. § 18-9-122(3), whereas the Act

specifies an eighteen-foot radius, Mass. Gen. Laws ch. 266, § 120E½(b).

C     The Colorado statute pretermits unwanted approaches within eight feet of anyone inside the specified area, Colo. Rev. Stat. § 18-9-122(3), while the Act constructs only a six-foot buffer zone, Mass. Gen. Laws ch. 266, § 120E½(b).

C     The directive that the Act apply only when an RHCF is open for business and has clearly demarcated the protected area, Mass. Gen. Laws ch. 266, § 120E½(c), is not part of the Colorado scheme.

C     The Act, unlike the Colorado law, exempts various groups of persons from its reach. Id. § 120E½(b).

In most of these respects, the Act arguably restricts less speech than its Colorado counterpart.

### D.  **Proceedings Below.**

The plaintiffs — Mary Anne McGuire, Ruth Schiavone, and Jean B. Zarrella — are Massachusetts residents who regularly protest, demonstrate, and provide sidewalk counseling outside RHCFs. Shortly after the passage of the Act, they sued a number of state hierarchs in the United States District Court for the District of Massachusetts. They argued that the Act violated their rights to freedom of speech, freedom of association, equal protection, and due process of law. To remedy these deprivations, they sought both a declaration of the Act's unconstitutionality and an injunction against its enforcement.

-10-

The district court determined that the Act offended the First Amendment in two ways. First, the court regarded the Act as an impermissible content-based restriction because it "pertain[s] exclusively to speech that communicates a message of protest, education, or counseling spoken at the entrances of abortion clinics." McGuire, 122 F. Supp. 2d at 102. Second, the court determined that the Act discriminated on the basis of viewpoint. Id. at 103. The court reasoned that the Act's exemption of agents and employees of RHCFs gives rise to this infirmity because, by virtue of their "personal relationship with the abortion clinic, [employees] have a strong financial interest or philosophic incentive to counsel the listener to undergo an abortion and they constitute very zealous advocates for this controversial procedure." Id. For these reasons, the court concluded that the plaintiffs had shown a substantial likelihood of success on the merits and enjoined the defendants from enforcing the Act pending a trial. Id. at 104.

This interlocutory appeal ensued. On motion duly filed, see Fed. R. App. P. 8(a), we stayed the injunction pending appeal. We now reverse.

## II. THE PRELIMINARY INJUNCTION STANDARD

A party who seeks a preliminary injunction must show: (1) that she has a substantial likelihood of success on the

merits; (2) that she faces a significant potential for irreparable harm in the absence of immediate relief; (3) that the ebb and flow of possible hardships are in favorable juxtaposition (i.e., that the issuance of an injunction will not impose more of a burden on the nonmovant than its absence will impose on the movant); and (4) that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996); Narragansett Ind. Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991). Appellate review of rulings granting or denying preliminary injunctions is quite deferential. The court of appeals will set aside such a ruling only if it is persuaded that the lower court mistook the law, clearly erred in its factual assessments, or otherwise abused its discretion in granting the interim relief. Ross-Simons, 102 F.3d at 15; Narragansett Ind. Tribe, 934 F.2d at 5.

## III.  THE FIRST AMENDMENT CHALLENGE

To place the appellants' First Amendment challenge into workable perspective, we begin with an overview of the constitutional doctrine governing restrictions on speech. We then consider whether the Act qualifies as content-neutral

legislation for First Amendment purposes.  After answering this question, we then subject the Act to the appropriate level of judicial scrutiny.  Throughout, we bear in mind that the plaintiffs have mounted a facial challenge to the Act as a whole, not an as-applied challenge to some particular application of it.

### A.   The Doctrinal Underpinnings.

Freedom of speech "is the matrix, the indispensable condition, of nearly every other form of freedom."  Palko v. Connecticut, 302 U.S. 319, 327 (1937) (Cardozo, J.).  Notwithstanding its exalted position in the pantheon of fundamental freedoms, free speech always must be balanced against the state's responsibility to preserve and protect other important rights.  This balance may be weighted differently, however, depending upon the nature of the restriction that the government seeks to foster.  We elaborate below.

Governmental restrictions on the content of particular speech pose a high risk that the sovereign is, in reality, seeking to stifle unwelcome ideas rather than to achieve legitimate regulatory objectives.  Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994).  As a general rule, therefore, the government cannot inhibit, suppress, or impose differential content-based burdens on speech.  Id. at 641-42.  To provide

-13-

maximum assurance that the government will not throw its weight on the scales of free expression, thereby "manipulat[ing] . . . public debate through coercion rather than persuasion," id. at 641, courts presume content-based regulations to be unconstitutional. R. A. V. v. City of St. Paul, 505 U.S. 377, 382 (1992); Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 736 (1st Cir. 1995). While courts theoretically will uphold such a regulation if it is absolutely necessary to serve a compelling state interest and is narrowly tailored to the achievement of that end, see, e.g., Boos v. Barry, 485 U.S. 312, 321-29 (1988); Ark. Writers' Project, Inc. v. Ragland, 481 U.S. 221, 231-32 (1987), such regulations rarely survive constitutional scrutiny.

Courts grow even more chary when the government attempts to differentiate between disparate views espoused by those speaking on a singular subject. That chariness — some might say hostility — is not surprising, for viewpoint-based discrimination is a particularly offensive type of content-based discrimination. Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).

Judicial review takes on a different cast when a statute does not regulate speech per se, but, rather, restricts the time, place, and manner in which expression may occur. Such

-14-

laws are less threatening to freedom of speech because they tend to burden speech only incidentally, that is, for reasons unrelated to the speech's content or the speaker's viewpoint. Where that description applies, courts employ a less exacting level of scrutiny, upholding limitations on the time, place, and manner of protected expression as long as "they are justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984). This less taxing level of analysis — commonly called "intermediate scrutiny" — makes sense because the very fact of content neutrality offers a meaningful assurance that the government is not striving in a clandestine manner to steer public discourse or brainwash its citizens. Turner Broad. Sys., 512 U.S. at 642. We start, then, by analyzing whether the Act is content-neutral.

## B. **Classifying the Act**.

The Supreme Court has explained that "the principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v.

-15-

Rock Against Racism, 491 U.S. 781, 791 (1989). Thus, a law designed to serve purposes unrelated to the content of protected speech is deemed content-neutral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched. See Hill, 530 U.S. at 736; City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48 (1986).

By addressing political speech on public streets and sidewalks, the Act plainly operates at the core of the First Amendment. See Hague v. CIO, 307 U.S. 496, 515 (1939) (noting that public streets and sidewalks are traditional public fora which "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"). First Amendment interests nonetheless must be harmonized with the state's need to exercise its traditional police powers. Hill, 530 U.S. at 714-15. The district court resolved this balance against the appellants. It opined that the state legislature enacted section 120E½ because it disagreed with both the content of, and the viewpoint inherent in, anti-abortion protests. See McGuire, 122 F. Supp. 2d at 102-03. The court thus concluded that the Act, on its face, discriminates against abortion-related speech, id. at 102, and that the employee exemption compounds this evil by facilitating the airing of pro-choice sentiments while

-16-

simultaneously restricting the expressive activities of pro-life partisans, id. at 103. We do not agree.

In holding that the Act constitutes invidious content-based discrimination against abortion-related speech, the lower court emphasized that "the Massachusetts statute applies exclusively to speech communicated at abortion clinics and not . . . to all health care facilities." Id. at 102. We believe that the court, in reaching this conclusion, misconstrued applicable First Amendment doctrine by focusing exclusively on the effects of the Act rather than on its underlying purpose.

The critical question in determining content neutrality is not whether certain speakers are disproportionately burdened, but, rather, whether the reason for the differential treatment is — or is not — content-based. See Hill, 530 U.S. at 719 (positing that a statute is content-neutral when it does not directly regulate speech, has its origins in a legislative purpose unrelated to disagreement with the underlying message of particular speech, and advances interests unconnected to expressive content). As long as a regulation serves a legitimate purpose unrelated to expressive content, it is deemed content-neutral even if it has an incidental effect on some speakers and not others. Ward, 491 U.S. at 791; Nat'l Amusements, 43 F.3d at 740. In that event, all that remains is

for the government to show that accomplishment of the legitimate purpose that prompted the law also rationally explains its differential impact. See City of Renton, 475 U.S. at 47-48; Nat'l Amusements, 43 F.3d at 738.

We conclude, without much question, that the Act's stated goals justify its specific application to RHCFs. The Massachusetts legislature, confronted with an apparently serious public safety problem, investigated the matter thoroughly. That investigation yielded solid evidence that abortion protesters are particularly aggressive and patients particularly vulnerable as they enter or leave RHCFs. Thus, targeting these sites furthers conventional objectives of the state's police power — promoting public health, preserving personal security, and affording safe access to medical services. Although the Act clearly affects anti-abortion protesters more than other groups, there is no principled basis for assuming that this differential treatment results from a fundamental disagreement with the content of their expression. Rather, the finding required on these facts is that the legislature was making every effort to restrict as little speech as possible while combating the deleterious secondary effects of anti-abortion protests. Just as targeting medical centers did not render Colorado's counterpart statute content-based, Hill, 530 U.S. at 722-23, so

-18-

too the Act's targeting of RHCFs fails to undermine its status as a content-neutral regulation.[1]

To be sure, the plaintiffs insist that the state's professed concerns about public safety, personal security, and access to medical facilities are mere pretexts for its desire to censor anti-abortion speech. This insistence gets them nowhere. For one thing, their insinuations are unsupported by any record evidence. For another thing, where differential treatment is justified, on an objective basis, by the government's content-neutral effort to combat secondary effects, it is insufficient that a regulation may have been adopted in direct response to

---

[1]The plaintiffs see this targeting as a smoking gun. In this regard, they cite Carey v. Brown, 447 U.S. 455 (1980), and Police Dep't of Chicago v. Mosley, 408 U.S. 92 (1972), for the proposition that singling out a certain form of protest is tantamount to content-based discrimination. These authorities are unhelpful. In Carey, the Court struck down a statute that prohibited residential protests other than peaceful labor picketing. 447 U.S. at 471. In Mosley, the Court overturned a statute that prohibited all protests except labor picketing near a school. 408 U.S. at 101-02. In each instance, the Court declared the statute unconstitutional because the legislative purpose — protecting residential privacy and preserving safe access to schools, respectively — could not logically account for the special treatment accorded to labor protests. Here, however, as in Hill, 530 U.S. at 724, the targeting is closely confined to the legitimate legislative purpose that underlies the Act: combating violence at RHCFs. See also City of Renton 475 U.S. at 47 (upholding a zoning ordinance that sought to prevent crime, protect residential neighborhoods, and maintain property values by singling out adult theaters).

the negative impact of a particular form of speech. See Hill, 530 U.S. at 723; Madsen v. Women's Health Ctr., 512 U.S. 753, 762-64 (1994); see also Nat'l Amusements, 43 F.3d at 740 ("Secondary effects can comprise a special characteristic of a particular speaker or group of speakers."). This is such a case: considered as a whole, the Act provides a neutral justification — unrelated to the content of speech — for differential treatment.

In an effort to parry this thrust, the plaintiffs point conspicuously to the district court's holding that the statutory exemption for clinic agents and employees constitutes impermissible viewpoint-based discrimination (and, therefore, taints the entire Act). The court premised this holding on its determination that, by allowing clinic employees to enter the floating buffer zone without constraint, the Act permits free-ranging expression of pro-choice views while suppressing pro-life messages. McGuire, 122 F. Supp. 2d at 103-04. Because this determination rests on an unsubstantiated factual foundation, we reject it.

A court's findings of fact must be anchored in probative evidence. See United States v. Frankhauser, 80 F.3d 641, 654-55 (1st Cir. 1996); Blohm v. Commissioner, 994 F.2d 1542, 1548 (11th Cir. 1993); United States v. Williams, 891 F.2d

-20-

962, 964-67 (1st Cir. 1989). This bedrock principle applies to findings made on a motion for a preliminary injunction. See, e.g., Cohen v. Brown Univ., 991 F.2d 888, 906 (1st Cir. 1993). Here, however, the district court lumped together all agents and employees of RHCFs and characterized them, without a shred of record support, as "very zealous advocates for this controversial procedure [abortion]." McGuire, 122 F. Supp. 2d at 103. The court then stated, again without any evidentiary predicate, that these "[e]mployees and agents of abortion clinics escort potential abortion clinic clients and counsel and exhort them to undergo an abortion within the restricted areas." Id. at 103 n.9. These findings are wholly unsupported and, hence, clearly erroneous. A judge's intuition cannot take the place of proof. See United States v. Ortiz, 966 F.2d 707, 717 (1st Cir. 1992) (holding that decisions must be based on more than the judge's hunch, unsupported by facts); cf. Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 590 (7th Cir. 2000) (noting that judges must reason from facts rather than settling for guesswork).

There is, moreover, another defect in the district court's treatment of the employee exemption. The court ignored the matter of secondary effects as they bear on that exemption. This was an unfortunate oversight: the secondary effects that

-21-

the Act was designed to ameliorate include securing public safety in and around RHCFs, preventing traffic congestion, and balancing free speech with the need to maintain a salutary atmosphere for those seeking access to medical services. See S.B. 148, supra, § 1. There is no evidence that agents and employees of RHCFs cause these problems.[2] Thus, excluding those individuals does not undermine the legitimacy of the Act as a vehicle to curb the secondary effects of particular conduct and thereby achieve the legislature's announced purposes.

The legislative history bears witness to this conclusion. Testimony taken before the state senate indicates beyond cavil that the employee exemption will promote the Act's goals because clinic employees often assist in protecting patients and ensuring their safe passage as they approach RHCFs. Indeed, the record contains numerous accounts of incidents in which clinic personnel had to approach patients to protect them from protesters and, sometimes, to prevent physical altercations. Since it is within the scope of their employment for clinic personnel to escort patients in this fashion, and since a primary purpose of the law is to facilitate safe access,

---

[2]To be sure, the record does show that, on occasion, a clinic employee has gotten into an altercation with an anti-abortion protester. But this sort of disturbance presumably would be stemmed by the exemption because the exemption tends to keep clinic employees and abortion protesters apart.

the employee exemption serves the basic objectives of the Act. To cinch matters, the legislature rationally could have concluded that clinic employees are less likely to engage in directing of unwanted speech toward captive listeners — a datum that the Hill Court recognized as justifying the statute there. See Hill, 530 U.S. at 715-17.

Endeavoring to counter these points, the plaintiffs posit that the employee exemption could not possibly have been designed to combat those undesirable secondary effects because the Act, without the exemption, permits any person to approach a non-consenting patient for purposes other than education, protest, and counseling. See Mass. Gen. Laws ch. 266, § 120E½(b). The exemption only has meaning, therefore, insofar as it allows those who work for RHCFs to approach within six feet of non-consenting patients to engage in such activities (i.e, education, protest, and counseling). From this plateau, the plaintiffs suggest that if a clinic employee were to approach to educate or counsel a prospective patient, that education or counseling doubtless would manifest a pro-choice viewpoint. So viewed, the sole practical purpose of the employee exemption is to promote a particular side of the abortion debate — a feature that renders the exemption discriminatory and ensures that any application would violate the First Amendment.

-23-

While this argument has a certain logic, it ultimately fails.  After all, the plaintiffs have challenged the Act on its face.  The nature of this challenge raises the bar for their success:  a party who mounts a facial challenge to a statute must carry a significantly heavier burden than one who seeks merely to sidetrack a particular application of the law.  See Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998); Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 76 (1st Cir. 2001); Watchtower Bible & Tract Soc'y, Inc. v. Vill. of Stratton, 240 F.3d 553, 562 (6th Cir.), petition for cert. filed, 69 U.S.L.W. 3750 (U.S. May 18, 2001) (No. 00-1737).

In the First Amendment context, this means that a plaintiff who challenges a statute on its face ordinarily must show either that the law admits of no valid application or that, even if one or more valid application exists, the law's reach nevertheless is so elongated that it threatens to inhibit constitutionally protected speech.  Time Warner Entm't Co. v. FCC, 93 F.3d 957, 967 (D.C. Cir. 1996).  The plaintiffs do not challenge the employee exemption on the ground that it sweeps too broadly.  Thus, they must show that the exemption admits of no constitutionally permissible application.  This is an uphill climb, requiring the legal equivalent of an alpenstock and carabiners — and the plaintiffs are unable to scale the heights.

-24-

Courts owe legislative judgments substantial respect and, as a general matter, should be reluctant "to reduce statutory language to a merely illustrative function." Mass. Ass'n of HMOs v. Ruthardt, 194 F.3d 176, 181 (1st Cir. 1999). The Massachusetts legislature may or may not have intended the employee exemption to serve the purpose envisioned by the plaintiffs. There are other likely explanations. For example, the legislature may have exempted clinic workers — just as it exempted police officers — in order to make crystal clear what already was implicit in the Act: that those who work to secure peaceful access to RHCFs need not fear prosecution. See id. (explaining that a legislative body "may consider a specific point important or uncertain enough to justify a modicum of redundancy").

The ultimate difficulty, of course, is that the legislature's subjective intent is both unknown and unknowable. At this juncture, we can look only to the purposes that may rationally be said to be served by the provision in question (here, the employee exemption). That is a large part of the reason why one who challenges a statute on its face must carry an appreciably heavier burden: a facial challenge, unlike an as-applied challenge, does not allow a reviewing court to base its judgments on actual experience or provide the court any room

-25-

to capture nuances in a statute's meaning.  See United States v. Raines, 362 U.S. 17, 20-22 (1960); Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1330-35 (2000).

That ends this aspect of the argument.  Because we can envision at least one legitimate reason for including the employee exemption in the Act, it would be premature to declare the Act unconstitutional for all purposes and in all applications.  See United States v. Hilton, 167 F.3d 61, 71 (1st Cir.) (noting that "[i]t makes little sense to strike down an entire statute in response to a facial attack when potential difficulties can be remedied in future cases through fact-specific as-applied challenges"), cert. denied, 528 U.S. 844 (1999).  If, as the plaintiffs predict, experience shows that clinic staffers in fact are utilizing the exemption as a means either of proselytizing or of engaging in preferential pro-choice advocacy, the plaintiffs remain free to challenge the Act, as applied, in a concrete factual setting.  See Pharm. Research & Mfrs., 249 F.3d at 78 (rejecting facial challenge to state statute without prejudice to plaintiff's right to launch an as-applied challenge after implementation of the statute).

We recapitulate.  The Act, on its face, is content-neutral.  Futhermore, although courts correctly regard viewpoint

discrimination as a particularly pernicious form of content discrimination, the Act does not discriminate against speakers based on their views. The employee exemption too is neutral on its face, drawing no distinction between different ideologies. And to the extent (if at all) that the exemption contributes to the Act's disproportionate impact on anti-abortion protesters, it can be justified by reference to the state's neutral legislative goals. We conclude, therefore, that since neither the Act as a whole nor the employee exemption reflects an impermissible bias against either the content of certain speech or the views of certain speakers, the Act's constitutionality must be determined by reference to the intermediate level of scrutiny that attaches to content-neutral time, place, and manner restrictions.

### C. <u>Intermediate Scrutiny</u>.

Under the intermediate scrutiny standard, a law is deemed constitutional if it is narrowly tailored to serve significant state interests while leaving open ample alternative channels of communication. <u>See</u> <u>Renton</u>, 475 U.S. at 50; <u>Clark</u>, 468 U.S. at 293. The Act passes this test.

The state legislature ascribed four purposes to the Act:[3] to increase public safety in and around RHCFs; to ensure smooth traffic flow; to balance free speech with the rights of persons seeking access to RHCFs to be free from hindrance; and to create an environment conducive to safe and effective medical services. S.B. 148, supra, § 1. The interests that underlie these purposes are firmly rooted in the state's traditional police powers, and these are precisely the sort of interests that justify some incidental burdening of First Amendment rights. See Hill 530 U.S. at 715 (noting the "enduring importance of the right to be free from persistent importunity, following and dogging after an offer to communicate has been declined") (citation and internal quotation marks omitted); Schenck v. Pro-Choice Network, 519 U.S. 357, 376 (1997) (extolling the significance of "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services"); see also Madsen, 512 U.S. at 772-73 ("The First Amendment does not demand that

---

[3]Although the state senate wrote this list of purposes as a preamble to Senate Bill No. 148, there is nothing in the subsequent legislative history to suggest that the purposes changed after the senate bill was amended in the house of representatives to produce the final version. We therefore follow the parties' lead and assume that this litany applies to the Act.

-28-

patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests.").

On the flip side of the coin, the Act is narrowly tailored and leaves open sufficient opportunity to communicate in other ways. A law is narrowly tailored if it promotes a substantial governmental interest that would be less effectively achieved without the law and does so without burdening substantially more speech than is necessary to further this goal. Ward, 491 U.S. at 799. The plaintiffs argue that Massachusetts previously had enacted a number of general protections designed to combat the same evils as the Act, e.g., Mass Gen. Laws ch. 266 § 120E (knowingly obstructing entry to health care facility); id. ch. 272 § 53 (disturbing the peace); id. ch. 12 § 11H (impairing civil rights); id. 265 § 13A (assault and battery), and that these non-speech-restricting protections have not been enforced in the context of abortion protests. They claim, moreover, that the only behavior targeted by the Act that is not already covered by other laws is non-threatening speech, and that the Commonwealth has offered no content-neutral justifications for limiting such peaceful discourse.

This argument is unconvincing. The Massachusetts legislature reasonably concluded that existing law inadequately

addressed the public safety, personal security, traffic, and health care concerns created by persistent demonstrations outside RHCFs. Indeed, the state senate specifically found that existing statutory protections did not suffice — and this finding is plausible given the general terms used by those statutes (e.g., "obstruction," "disturbing the peace"). While such wider nets might catch the big fish, there is every reason to believe that they would let the fingerlings through. We have said enough on this subject. The short of it is that the legislature weighed the <u>Hill</u> Court's conclusions and formulated a bill to suit. As a result of this careful craftsmanship, the Act, in its final form, affects only areas immediately adjacent to RHCFs; prohibits only nonconsensual approaches within six feet; and applies only within a clearly marked eighteen-foot radius from clinic entrances and exits. This framework is more precisely focused and gives abortion protesters more opportunity for advocacy than does the Colorado statute upheld in <u>Hill</u>. <u>Compare</u> Mass. Gen. Laws ch. 266, § 120E½ <u>with</u> Colo. Rev. Stat. § 18-9-122.[4] Because the Supreme Court concluded that the

---

[4]To illustrate, the Act creates a six-foot bubble around unwilling listeners, as opposed to the eight-foot bubble sanctioned under the Colorado law; the Act covers an eighteen-foot radius as opposed to the 100-foot radius covered by the Colorado statute; and the Act, unlike its Colorado counterpart, does not go into effect unless and until the covered area has been clearly delineated.

Colorado statute was narrowly tailored, the Act too satisfies that requirement. If, as the <u>Hill</u> Court stated, visual and verbal images are able to cross an eight-foot floating buffer zone with sufficient ease that the "restriction on an unwanted physical approach leaves ample room to communicate a message through speech," 530 U.S. at 729, that same conclusion perforce must apply to the Act's less commodious six-foot floating buffer zone.

### D.  **The Equal Protection Challenge**.

Without developing the argument in detail, the plaintiffs, like the court below, conclusorily assert that the Act violates the Equal Protection Clause. Because the equal protection interests involved in the differential treatment of speech are inextricably intertwined with First Amendment concerns, <u>Police Dep't of Chicago</u> v. <u>Mosley</u>, 408 U.S. 92, 95 (1972), and the plaintiffs do not develop the point separately, we treat this assertion as part of the plaintiffs' First Amendment challenge. In all events, it need not occupy us for long.

From time to time, the Supreme Court has invoked equal protection rather than free speech, as the basis for invalidating a content-based speech restriction. <u>E.g.</u>, <u>Carey</u> v. <u>Brown</u>, 447 U.S. 455, 459-63 (1980); <u>Mosley</u>, 408 U.S. at 94-95.

-31-

But where the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily passes the rational basis test employed under the Equal Protection Clause. See Thorburn v. Austin, 231 F.3d 1114, 1122 (8th Cir. 2000); Hoover v. Morales, 164 F.3d 221, 227 n.3 (5th Cir. 1998); DLS, Inc. v. City of Chattanooga, 107 F.3d 403, 411 n.7 (6th Cir. 1997). So it is here: the Act passes muster under the Equal Protection Clause for the same reasons that it passes muster under the First Amendment.

## IV. THE DUE PROCESS CHALLENGE

The failure of the plaintiffs' First Amendment challenge does not end our journey. Even if the trial court's rationale collapses, an appellee is free to defend the judgment below on any other ground made manifest by the record. Mass. Mut. Life Ins. Co. v. Ludwig, 426 U.S. 479, 481 (1976) (per curiam); United States v. Craven, 239 F.3d 91, 97 (1st Cir. 2001). Embracing that tenet, the plaintiffs urge us to affirm the issuance of the preliminary injunction on the ground that the Act vests unbridled discretion in RHCFs (and, thus, violates the plaintiffs' due process rights).

This exhortation hinges upon language in the Act which provides that the six-foot floating buffer zone "shall only take effect during a facility's business hours and if the area

-32-

contained within the radius . . . is clearly marked."  Mass. Gen. Laws ch. 266, § 120E½(c).  The plaintiffs posit that this language vests private actors — the RHCFs — with unconstrained power to restrict speech, and they cite numerous cases for the black-letter proposition that the Due Process Clause forbids standardless delegations of governmental authority, especially to private parties.  E.g., Forsyth County v. Nationalist Movement, 505 U.S. 123, 130-31 (1992); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 758-59 (1988); Freedman v. Maryland, 380 U.S. 51, 57-59 (1965).

The district court rejected this asseveration, concluding that the quoted portion of the Act "is more logically viewed as a notice requirement serving to protect the interests of speakers such as plaintiffs."  McGuire, 122 F. Supp. 2d at 101 n.7.  We agree with this assessment.  While the plaintiffs cherry-pick statements from the case law in an effort to bolster their position, they have wrested these statements from their contextual moorings.

Without exception, the cases on which the plaintiffs rely involve licensing schemes that allowed public officials to make discriminatory, content-based decisions.  E.g., City of Lakewood, 486 U.S. at 759; Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 648-49 (1981).  By their very

-33-

nature, licensing schemes that embody grants of standardless discretion to public officials (or sometimes private individuals — conceptually, it makes no difference) cannot constitute valid time, place, and manner restrictions because they "ha[ve] the potential for becoming a means of suppressing a particular point of view."  Heffron, 452 U.S. at 649.  Since the floating buffer zone contemplated by the Act is content-neutral, see supra Part III(B), the activation provision cannot raise this type of constitutional concern.  And in all events, the activation provision, to the extent that it allows clinic employees to make decisions that have a disproportionate impact on anti-abortion speech, is easily justified as an incidental burden.[5]  See Nat'l Amusements, 43 F.3d at 740.

## V.  CONCLUSION

The existence of a four-part framework for granting or denying preliminary injunctive relief does not mean that all four components are weighted equally.  In the great majority of cases, likelihood of success constitutes the proper focal point of the inquiry.  Ross-Simons, 102 F.3d at 16.  This case is no exception.  The district court premised its issuance of a

---

[5]We note an irony:  as a practical matter the activation provision tends to favor (rather than curtail) anti-abortion expression because it establishes conditions that RHCFs must meet before the Act's prophylaxis takes effect.

preliminary injunction on its mistaken view that the plaintiffs probably would succeed on their First Amendment challenge. But this conclusion is insupportable. See supra Part III(B-C). Moreover, the plaintiffs cannot establish a probability of merits success on any other theory encompassed within their facial challenge to the Act. See supra Parts III(D), IV. Since likelihood of success is the sine qua non of preliminary injunctive relief, Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993), we need go no further.

**We reverse the order granting a preliminary injunction and remand for further proceedings consistent with this opinion. The stay previously issued is dissolved as moot**.

## Appendix A

## Mass. Gen. Laws ch. 266, § 120E½

SECTION 120E½: Reproductive Health Care Facilities

(a) For the purposes of this section, "reproductive health care facility" means a place, other than within a hospital, where abortions are offered or performed.

(b) No person shall knowingly approach another person or occupied motor vehicle within six feet of such person or vehicle, unless such other person or occupant of the vehicle consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education or counseling with such other person in the public way or sidewalk area within a radius of 18 feet from any entrance door or driveway to a reproductive health care facility or within the area within a rectangle not greater than six feet in width created by extending the outside boundaries of any entrance door or driveway to a reproductive health care facility at a right angle and in straight lines to the point where such lines intersect the sideline of the street in front of such entrance door or driveway.  This subsection shall not apply to the following: —

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

(c) The provisions of subsection (b) shall only take effect during a facility's business hours and if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted.

(d)  Whoever  knowingly  violates  this  section  shall  be punished, for the first offense, by a fine of not more than $500 or not more than three months in a jail or house of correction, or by both such fine and imprisonment, and for each subsequent offense, by a fine of not less than $500 and not more than two and one-half years in a jail or house of correction, or both such fine and imprisonment.  A person who knowingly violates this section may be arrested without a warrant by a sheriff, deputy sheriff or police officer if that sheriff, deputy sheriff, or police officer observes that person violating this section.

(e) Any person who knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a reproductive health care facility shall be punished, for the first offense, by a fine of not more than $500 or not more than three months in a jail or house of correction, or by both such fine and imprisonment, and for each subsequent offense, by a fine of not less than $500 and not more than $5,000 or not more than two and one-half years in a jail or house of correction, or both such fine and imprisonment. A person who knowingly violates this section may be arrested without a warrant by a sheriff, deputy sheriff or police officer.

(f)  A reproductive health care facility or a person whose rights to provide or obtain reproductive health care services have been violated or interfered with by a violation of this section or any person whose rights to express their views, assemble or pray near a reproductive health care facility have been violated or interfered with may commence a civil action for equitable relief.  The civil action shall be commenced either in the superior court for the county in which the conduct complained of occurred, or in the superior court for the county in which any person or entity complained of resides or has a principal place of business.

**S.B. 148, 181st Gen. Ct., Reg. Sess. (Mass. Jan. 6, 1999)**

An Act relative to reproductive health care facilities

<u>Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same as follows</u>:

SECTION 1. It is hereby found and declared that existing law does not adequately protect the public safety in the areas in and around reproductive health care facilities. Indeed, such facilities in the Commonwealth of Massachusetts have been the focal point of many blockades, disturbances and even violence, particularly the shootings at two reproductive health services facilities on December 30, 1994, which, left two persons dead and many injured.

It is further found that persons attempting to enter or depart from reproductive health care facilities have been subject to harassing or intimidating activity by persons approaching within extremely close proximity and shouting or waving objects at them, which has tended to hamper or impede access to or departure from those facilities.

It is further found that such activity near reproductive health care facilities creates a "captive audience" situation because persons seeking health care services cannot avoid the area outside of reproductive health care facilities if they are to receive the services provided therein, and their physical and emotional ailments or conditions can make them especially vulnerable to the adverse physiological and emotional effects of such harassing or intimidating activities directed at them from extremely close proximity.

It is further found that the violence and disturbances described above have required the deployment of police officers at significant cost to the cities and towns of the Commonwealth, and continue to occur despite civil injunctions that prohibit certain persons from engaging in such conduct.

And it is further found that studies have shown that clinics with buffer zones experience far larger decreases

in every type of violence than clinics without buffer zones.

Therefore, the purpose of this legislation is:

(1) to increase the public safety in and around reproductive health care facilities;

(2) to maintain the flow of traffic and prevent congestion around reproductive health care facilities;

(3) to enact reasonable time, place and manner restrictions to reconcile and protect both the First Amendment rights of persons to express their views near reproductive health care facilities and the rights of persons seeking access to those facilities to be free from hindrance, harassment, intimidation and harm; and

(4) to create an environment in and around reproductive health care facilities which is conducive towards the provision of safe and effective medical services, including surgical procedures, to its patients.

SECTION 2. Chapter 266 of the General Laws is hereby amended by inserting after section 120E the following section: —

(a) For the purposes of this section, "reproductive health care facility" shall mean a place, other than within a hospital, where abortions are offered or performed.

(b)(1) Except for those listed in subsection (2) below, no person shall, during business hours of a reproductive health care facility, knowingly enter or remain in the following area of private property of a reproductive health care facility or public right-of-way:

(A) the area within twenty-five (25) feet of any portion of an entrance to, exit from, or driveway of a reproductive health care facility; and

(B) the area within the rectangle created by extending the outside boundaries of any entrance to, exit from, or driveway of, a reproductive health care facility in straight lines to the point where such lines intersect

-39-

the sideline of the street in front of such entrance, exit or driveway.

(2) The provision of subsection (1) of this paragraph shall not apply to the following:

(A) persons entering or leaving such facility;

(B) employees or agents of such facility acting within the scope of their employment;

(C) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(D) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

(c) Whoever knowingly violates this section shall be punished, for the first offense, by a fine of not more than one thousand dollars or not more than six months in a jail or house of correction or both, and for each subsequent offense by a fine of not less than five hundred dollars and not more than five thousand dollars or not more than two and one-half years in a jail or house of correction or both.

A person who knowingly violates this section may be arrested without a warrant by a sheriff, deputy sheriff, or police officer.

(d) Any reproductive health care facility or any person whose rights to provide or obtain reproductive health care services have been interfered with by a violation of this section may commence a civil action for damages or injunctive and other equitable relief, including the award of compensatory and exemplary damages. Said civil action shall be instituted either in the superior court for the county in which the conduct complained of occurred, or in the superior court for the county in which any person or entity complained of resides or has a principal place of business. An aggrieved person or entity which prevails in an action authorized by this paragraph, in addition to other damages, shall be entitled to an award of the costs of the litigation and reasonable attorney's fees in an amount to be fixed by the court.

(e) A criminal conviction pursuant to the provision of this section shall not be a condition precedent to maintaining a civil action pursuant to the provision of this section.

SECTION 3. The provisions of this act shall be deemed severable, and if any provision of this act is adjudged unconstitutional or invalid, such judgment shall not affect other valid provisions hereof.