WESTFIELD HIGH SCHOOL L.I.F.E. CLUB, Stephen Grabowski, by and through his parents, Edmund and Mary Etta Grabowski, Timothy Souza and Daniel Souza, by and through their parents, Ralph and Diane Souza, Sharon Sitler and Paul Sitler, by and through their parents, William and Denise Sitler, and Dustin Cooper, by and through his parents Brian and Amy Turner–Cooper, Plaintiffs

v.

CITY OF WESTFIELD, Thomas Y. McDowell, Individually and in his official capacity as Superintendent of Westfield Public Schools, and Thomas W. Daley, Individually and in his official capacity as Principal of Westfield High School, Defendants

No. CIV.A. 03–30008–FHF.

United States District Court, D. Massachusetts.

March 17, 2003.

Bertin C. Emmons, Weymouth, MA, Mathew D. Staver, Erik W. Stanley, Joel L. Oster, Anita L. Staver, Liberty Counsel, Longwood, FL, for Westfield High

School L.I.F.E. Club, Stephen Grabowski, by and through his parents, Edmund and Mary Ettar Grabowski, Timothy Souza, Daniel Souza, by and through their parents, Ralph and Diane Souza, Sharon Sitler, Paul Sitler, by and through their parents, William and Denise Sitler, Dustin Cooper, by and through his parents Brian and Amy Turner–Cooper, Plaintiffs.

Claire L. Thompson, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, Peter H. Martin, Asst. City Solicitor, Westfield, MA, for Westfield Public Schools, Thomas Y. McDowell, Dr., Individually and in his official capacity as Superintendent of Westfield Public Schools, City of Westfield.

Claire L. Thompson, Doherty, Wallace, Pillsbury & Murphy, Springfield, MA, Edward P. Mulvaney, Fallon & Sullivan, Springfield, MA, for Thomas W. Daley, Individually and in his official capacity as Principal of Westfield High School.

Eric W. Treene, Jeremiah Glassman, Franz R. Marshall, Amy I. Berman, Edward G. Caspar, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, for U.S.

MEMORANDUM AND ORDER

FREEDMAN, Senior District Judge.

## I. INTRODUCTION

Before the Court is the plaintiffs' motion for a preliminary injunction. The plaintiffs request the Court enjoin the defendants from enforcing allegedly unconstitutional school speech policies, from imposing in-school suspensions on the plaintiffs, and from prohibiting the plaintiffs from distributing religious literature to other students during non-instructional time. *See* Plaintiffs' Motion for Preliminary Injunction (Doc. No. 7). The defendants oppose the motion. *See* Defendants' Opposition (Doc. No. 26).

## II. FACTUAL BACKGROUND

The following facts derive from the pleadings and various affidavits and exhibits filed in support of, and in opposition to, the plaintiffs' motion for a preliminary injunction.

### A. *The Parties*

The plaintiffs are present and former Westfield High School ("Westfield High" or "school") students who are or were members of the Westfield High School Life and Insight For Eternity Club ("LIFE Club" or "Club"), the students' parents, and the LIFE Club itself. The defendants are the City of Westfield,[1] Dr. Thomas Y. McDowell, the superintendent of the Westfield Public Schools ("Superintendent McDowell"), and Thomas W. Daley, the principal of Westfield High ("Principal Daley") (collectively, the "defendants").

The United States of America ("United States") and the American Civil Liberties Union of Massachusetts ("ACLU") have filed briefs as amici curiae. *See* United States Amicus Curiae Brief (Doc. No. 28); ACLU Amicus Curiae Brief (Doc. No. 36).

### B. *The LIFE Club*

Sometime during the 2000–2001 school year, a group of students at Westfield High approached Principal Daley about organizing a Bible club on school premises. Principal Daley was amenable to the idea, provided that the group secure an adult sponsor to be present at the Club's activities. The school required all student orga-

---

1. At oral argument, plaintiffs' counsel moved to substitute the "City of Westfield" in place of "Westfield Public Schools" as the properly named defendant in this case. The Court granted the motion pursuant to Fed.R.Civ.P. 15(a), (c)(3).

nizations to have adult sponsors. The LIFE Club began when Craig Spooner, a teacher at Westfield High, volunteered to serve as the Club's adult sponsor.

The LIFE Club meets in Mr. Spooner's classroom after school. Principal Daley attests that such an arrangement is "standard practice" for student organizations at the school.[2] In addition to accommodating meetings, the school permits the LIFE Club to announce its after-school activities in the daily school bulletin, subject to the same pre-approval process required of all other student organizations. The school also allows the Club to put up posters announcing meetings and activities on approved locations within the school. If the Club wishes to use the school auditorium, its members must complete a building use form and submit it to the administration in the same way as all other student organizations. The school also permits the Club to meet at the flagpole on school grounds before the start of each school day to conduct a morning prayer.

As the plaintiffs describe it, the LIFE Club is a student-initiated, student-led Christian club that is unrelated to the school's curriculum.[3] The LIFE Club's members, all students at Westfield High, congregate together the first and third Monday of every month, where they engage in Bible study discussion, prayer, and plan various service projects. Club members participate in service projects by assisting local soup kitchens, clothing drives, and food drives. Presumably, participation in these service activities occurs outside school grounds.

## C. School Speech Policies

Every year, the Westfield Public Schools distribute to students a parent-student handbook containing, among other things, school policies. *See* Verified Complaint (Doc. No. 1), Exhibit B, at 23 (Westfield Public Schools Parent–Student Handbook for Westfield High School 2002–2003) ("Student Handbook"). During all times relevant to this lawsuit, the following policies were in effect.[4]

The policy regarding "Freedom of Speech, Assembly or Congregation" ("Free Speech Policy") reads:

---

2. Westfield High's policy regarding "Clubs, Organizations and Activities" ("School Organization Policy") reads:

 Students at Westfield High are offered many opportunities to participate in extracurricular activities. Students are encouraged to enhance their lives with participation in one of the clubs, organizations, or activities that are listed here.

 Announcements will be made over the public address system and on posters concerning the following extra-curricular offerings. Further details may be secured from the adviser, your homeroom teacher or guidance counselor. *Clubs or organizations must be sanctioned or organized by the school and open to general membership.*

 Verified Complaint (Doc. No. 1), Exhibit B, at 33 (Westfield Public Schools Parent–Student Handbook for Westfield High School 2002–2003) (emphasis added).

3. As will become apparent, the LIFE Club's relationship to the school is a contentious

issue in this litigation, since that relationship governs the level of censorship the school may have over the group's speech activities.

4. Curiously, in their answers to the plaintiffs' verified complaint, the defendants "neither admit nor deny the allegations [that the speech policies were in effect during all times relevant to this lawsuit] ... but call upon the Plaintiffs to prove the same." *See* School's and Superintendent's Answer (Doc. No. 22), at ¶¶ 44, 48, 56; Principal's Answer (Doc. No. 24), at ¶¶ 44, 48, 56. Such averments are impermissible under the rules of responsive pleading. *See* Fed.R.Civ.P. 8(b) (a party shall "admit or deny" or state that the party is "without knowledge or information sufficient to form a belief as the truth of an averment"). Thus, the Court will treat the defendants' failures to deny the plaintiffs' averments as admissions. *See* Fed.R.Civ.P. 8(d).

The freedoms of speech and the right to assemble are two principles upon which this country is based. These freedoms are subject to the limits of obscenity, defamation, fighting words, incitement, or disruption as defined by the Massachusetts Department of Education. *Responsible speech* will be allowed in the proper location at the proper time, so as not to stop other people from entering classes, distributing literature during classes, or hold a demonstration, so that it interferes with classes or homerooms in session. The use of symbolic expressions of publishing/distributing of material is subject to the same limitations as listed for freedom of speech.

Permission to assemble cannot be allowed so as to violate state and local laws. Permission to assemble must be requested in writing from the principal or his designee. The request must be made two (2) days prior to the desired time and should include the following: time, place, purpose and supervision provisions which will state the person or group who will be in charge and responsible.

Verified Complaint (Doc. No. 1), Exhibit B, at 23 (emphasis added). As the plaintiffs point out, the phrase "responsible speech" is defined nowhere in the Student Handbook or elsewhere.

The policy regarding the "Posting of Information and Distribution of Materials" ("Distribution Policy") reads:

The daily bulletin is posted each day on the bulletin board outside the main office. Driver Education lists are also posted there when classes are being formed. The Guidance Office has bulletin boards that post information that may be pertinent to all students. These bulletin boards should be checked from time to time for items of interest. Posters, displays and leaflets are subject to approval by the Student Council and administration. Unauthorized use of bulletin boards, displays or posting of leaflets may cause the material to be removed and the person or persons who displayed or posted the materials to be subjected to disciplinary measures. Posters should not be hung on smooth painted areas, nor in windows of corridor doors obscuring vision up or down the corridor. All offending posters will be removed and destroyed. All posters must come down the next school day after the event. Handbills or any other printed matter may not be distributed or circulated in school or on the school grounds without proper authority. Arrangements should be made with an administrator or his designee.

*Id.* at 27. For simplicity, the Court will refer to these written policies included in the Student Handbook collectively as the "speech policies."

Although the plaintiffs maintain that no appeal process exists by which an aggrieved student may challenge an administrator's refusal to grant permission to distribute literature, the Court notes the school's policy regarding "Due Process Rights" ("Due Process Policy") which reads:

In situations involving discipline or other consequential action, the Westfield Public School district acknowledges its responsibility to afford students due process and timely resolution to proceedings, as mandated by state and federal statutes and the regulations of the Commonwealth of Massachusetts. For all actions, students have the right to be informed of the charges or issues, to be given an opportunity to respond and to be apprised of the outcome and any applicable appeal procedures. The specific responsibility of the district regarding due process is dependant upon the

action under consideration by the district in any given situation. Procedures to address specific mandates are outlined accordingly throughout Section J.[5] In addition to procedures specifically stated, the district supports the efforts of students and parents/guardians in directing student specific programmatic or procedural concerns to appropriate staff throughout the system.

*Id.* at 23.

In addition to the policies explicitly mentioned in the Student Handbook, the school appears to have a speech policy governing the distribution of literature unrelated to school curriculum ("Distribution Policy Regarding Literature Unrelated to Curriculum"). In a letter faxed to plaintiffs' counsel, Superintendent McDowell stated the following as definitive school policy:[6]

... we have allowed the Bible study group to meet on our premises after school hours with the same caveats as any other group who requests to use our facilities, thus allowing equal access to school grounds.

*We do not allow students to distribute non-school curriculum or activity related literature of any kind directly to other students on school grounds.* We do not single out students based upon the content of their message, in this or any other instance. Should a student or group of students simply wish to distribute candy canes with no message, it would be treated in the same manner, as would a handout advertising a sale at a local store.

Verified Complaint (Doc. No. 1), Exhibit D, at 1 (Letter from Superintendent McDowell to Plaintiffs' Attorney) (emphasis added).

With all of these policies in mind, the Court will proceed to recount the events most germane to this litigation, which involve LIFE Club members distributing religious messages attached to candy canes to other students at Westfield High.

### D. *Candy Canes*

The plaintiffs maintain that they first asked for and were granted permission to distribute the candy canes with religious messages just before the Winter Break of 2000. During oral argument, however, defendants' counsel stated that the school was "unaware" of this first candy cane distribution.[7]

The second incident occurred one academic year ago, just before Winter Break of 2001. LIFE Club members asked Principal Daley for permission to distribute candy cases with a religious message attached. The front of the message read "Merry Christmas" in large lettering on the left side, and the right side contained information about LIFE Club meetings and a Bible passage:

LIFE Bible Club
Every first and third Monday of every month
2:00 - 3:00 in Room 330
L ove and
I nsight
F or
E ternity

---

**5.** It is unclear as to what "Section J" refers.

**6.** There is no indication of when and in what manner the school implemented this policy. Nowhere is the policy mentioned in the Student Handbook. From all indications, Superintendent McDowell's letter appears to be the first announcement of this policy.

**7.** The Court held a non-evidentiary hearing on the plaintiffs' motion for a preliminary injunction. While the parties may genuinely dispute whether this first distribution occurred, an evidentiary hearing on this particular factual issue is unnecessary at this time, since the Court believes it can resolve the legal issue of the plaintiffs' likelihood of success on the merits without having to consider this first candy cane distribution.

"And this is my prayer: that your love may abound more and knowledge and depth of insight, so that you may be able to discern what is best and may be pure and blameless until the day of Christ, filled with the fruits of righteousness that comes through Jesus Christ—to the glory and praise of God." Philippians 1:9–11

Defendants' Mem. in Opp'n (Doc. No. 26), Exhibit A, at 1 (message attached to candy canes).

The inside of the same message contained the story behind the creation of the candy cane and a prayer:

According to legend there was a candy maker who wanted to invent a candy that was a witness to Christ. The result was the candy cane. First of all, he used a hard candy because Christ is the Rock of Ages. This hard candy was shaped so that it would resemble a "J" for Jesus or a shepherd's staff. He made it white to represent the purity of Christ. Finally, a red stripe was added to represent the blood of Christ that was shed for the sins of the world and three thinner red stripes for the stripes he received on our behalf when the Roman soldiers whipped him. The flavor of the candy is peppermint, which is similar to hyssop. Hyssop is in the mint family and was used in the Old Testament for purification and sacrifice. Jesus is the pure Lamb of God, who came to be a sacrifice for the sins of the world. Too often the true meaning of Christmas is lost in commercialism and the stress of the holiday season. One thing that we can be thankful for is the salvation that God has given us through Jesus Christ, instead of worrying about what present

we are going to get. The gift of salvation is the greatest gift anyone could ever give us. It is better than getting a new car, and it is better than a gift certificate to the mall. And it's free!

Remember: It is not a prayer that saves you. It is trusting Jesus Christ that saves you. Prayer is simply how you tell God what you are doing. If you want to receive this awesome gift just be real with God and ask Him for it!

Dear God,

I know I am a sinner, and I know I should be punished. I believe that Christ died for me and took the punishment for my sins, and then rose from the dead three days after he died. I trust Jesus Christ alone as my savior. Thank you for your forgiveness and everlasting life that I know I now have.

In Jesus' name, Amen.

Now your whole life is new!

*Id.* at 2, 3. Another version of the message also included the quotation:

"For God so loved the world that He gave his one and only Son, so that all who believe in Him shall not perish but have eternal life." John 3:16

*Id.* at 3. The Court will refer to this entire message as the "religious message."

The plaintiffs allege that Principal Daley reviewed the content of the religious message and told LIFE Club members that they could not distribute the message because he considered it "offensive." Principal Daley, however, offered the members permission to distribute the candy canes if they changed the message to something non-offensive, such as "Seasons Greetings" or "Happy Holidays" ("secular message").[8]

---

**8.** Principal Daley states in his answer that he "neither admits nor denies the allegation[ that he told the Club it could distribute a non-offensive message like "Happy Holidays" or

"Season's Greetings"] but calls upon the Plaintiffs to prove the same." *See* Principal's Answer (Doc. No. 24), at ¶ 51. As mentioned before, this failure to deny facts averred in the

Members agreed to change the wording in the message to read "Happy Holidays from the Bible Club" and distributed candy canes with the secular message to their classmates.

The third and final incident occurred just before Winter Break of 2002. Over the course of a week, Plaintiff Stephen Grabowski repeatedly asked Principal Daley, and eventually Superintendent McDowell, for permission to distribute the candy canes with the religious message. Principal Daley and Superintendent McDowell repeatedly denied the request. The parties disagree over whether Grabowski asked for permission to distribute during only non-instructional time.

In his affidavit, Principal Daley justifies his denial by referring to a 1998 directive from former Superintendent of Schools, James F. Shea, and the American Association of School Administrators. *See* Defendants' Opposition (Doc. No. 26), Exhibit B, at 1–2 (Daley Aff.), 3 (Shea Directive), 4–7 (pamphlet entitled "Religious Holidays in the Public Schools—Questions and Answers"). The Shea Directive announces: "While recognizing the holiday season, none of the school activities should have the purpose of promoting or inhibiting religion." Defendants' Opposition (Doc. No. 26), Exhibit B, at 3 (Shea Directive). Principal Daley attests that he believes his actions conform with the policy in the Shea Directive.

In a letter faxed to plaintiffs' counsel, however, Superintendent McDowell states a different reason:

We do not allow students to distribute non-school curriculum or activity related literature of any kind directly to other students on school grounds. We do not single out students based upon the content of their message, in this or any other instance. Should a student or group of students simply wish to distribute candy canes with no message, it would be treated in the same manner, as would a handout advertising a sale at a local store.

Verified Complaint, Exhibit D, at 1 (Letter of Superintendent McDowell to Plaintiffs' Counsel).[9]

Despite the school's denials of permission, LIFE Club members decided to distribute the candy canes anyway. The plaintiffs admit to distributing approximately 450 candy canes to fellow students during the school day and during non-instructional time between classes and during lunch.

E. *School Imposed Discipline*

When the plaintiffs returned to school after Winter Break on January 2, 2003, members were immediately summoned to Principal Daley's office. Principal Daley informed the members that each would have to serve a one-day in-school suspension for insubordination, defined by the Student Handbook as "the direct refusal to follow the normal, customary and reasonable request of a school authority," Verified Complaint (Doc. No. 1), Exhibit B, at 25, for distributing the candy canes with

---

plaintiffs' verified complaint constitutes an admission of such facts. *See* Fed.R.Civ.P. 8(d).

9. In response to Superintendent McDowell's letter stating the Distribution Policy Regarding Literature Unrelated to Curriculum, three of the plaintiffs have submitted affidavits indicating that they distributed numerous Valen-

tine's Day cards with cookies to friends and acquaintances at the school during the school day on February 14, 2003. *See* Sharon Sitler Aff. (Doc. No. 33), Daniel and Timothy Souza Aff. (Doc. No. 34). The purpose of this submission appears to be a showing that this policy is unenforced.

the religious message after the Club was denied permission to do so.

Later that afternoon, Mary Etta Grabowski and Denise Sitler, mothers of three of the plaintiffs, delivered a letter to Superintendent McDowell requesting the suspensions be stayed until the school board held a hearing on the matter. Soon thereafter, the Superintendent's Office responded, indicating that the suspensions would be stayed pending an appeal to the School Committee. The Superintendent's Office also sent a Revised Notice of Suspension to all parents of LIFE Club members;[10] the notice stated that parents had a ten day time period in which to appeal the decision. Since the parents' appeal to the Superintendent's Office, no further action has been has been taken.

## F. *In–Class Distribution Revealed*

The defendants submitted the transcript of a WFCR news interview occurring on January 29, 2003, in which one of the plaintiffs, Stephen Grabowski, acknowledged distributing candy canes to fellow students in class. The defendants also present the affidavit of teacher Khalil Rivera, dated February 10, 2003, which, the defendants believe, also indicates that distribution occurred during the beginning of class periods as well. *See* Defendant's Mem. in Opp'n (Doc. No. 26), Exhibit D (Rivera Aff.). Mr. Rivera recalls one of the plaintiffs, Sharon Sitler, asking him permission to distribute candy canes at the beginning of Spanish class as he was taking attendance. Mr. Rivera granted her permission, unaware that Principal Daley prohibited the Club from doing so. Plaintiff Sitler never showed Mr. Rivera what

was attached to the candy cane nor did she give him one.

Later that same day, another plaintiff, Stephen Grabowski, made the same request of Mr. Rivera after the bell had rung signaling the beginning of class. As Grabowski passed out the candy canes, Mr. Rivera recalls hearing Grabowski say that he could get suspended for distributing the candy canes. Upon hearing this, Mr. Rivera asked to see what was attached to the candy cane. Mr. Rivera read the message, and his affidavit mentions nothing further about the class.

Looking at all evidence before the Court, there appears to be no indication that Principal Daley knew about the in-class distributions at the time the student plaintiffs were first told of their suspensions; and there appears to be no indication that Principal Daley justified the suspensions of all six student plaintiffs on these particular in-class incidents, which involved only two of the student plaintiffs.

## G. *The Harms Alleged*

The plaintiffs complain that the school's policies deny them their statutory and constitutional rights to free speech. The plaintiffs also identify several other harms stemming from enforcement of the school's speech policies. For instance, they allege that a suspension would result in Plaintiff Sharon Sitler being removed from the National Honor Society, which would disadvantage her in the college admissions process. They further allege that Plaintiff Paul Sitler would also be disadvantaged when he eventually applies for admission to the Air Force Academy.

---

**10.** The only perceivable difference between the notice and the revised notice is that the notice cites page 60 as grounds for suspension and the revised notice cites pages 60–61.

The parties have not provided the Court with the sources to which these page numbers refer.

## III. LEGAL STANDARDS

The Court may order a preliminary injunction if the plaintiffs can demonstrate that (1) they have a substantial likelihood of prevailing on the merits, (2) they face a significant potential of suffering irreparable harm in the absence of immediate relief, (3) issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs, and (4) issuing an injunction will promote or, at least not impair, the public interest. *See McGuire v. Reilly,* 260 F.3d 36, 42 (1st Cir.2001).

## IV. DISCUSSION

The plaintiffs seek to preliminarily enjoin the defendants from engaging in numerous actions. Specifically, the plaintiffs seek an order that enjoins enforcement of the allegedly unconstitutional policies which also states that:

(1) Defendants shall not prohibit Plaintiffs from distributing literature to fellow students during non-instructional time based on the content or viewpoint of the literature;

(2) Defendants shall not impose a prior restraint upon Plaintiffs' right to distribute literature to fellow students during non-instructional time;

(3) Defendants shall not punish Plaintiffs in any way for distributing literature to fellow students during non-instructional time;

(4) Defendants' Policies shall not be used in any other manner to infringe upon Plaintiffs' statutory and Constitutional rights.

Verified Complaint (Doc. No. 1), at 23–24.

A. *Preliminary Issues*

1. *Legal Standing*

■ The defendants argue that the LIFE Club is not a legal entity and lacks capacity to bring suit in its own name. Consequently, the defendants request this Court to dismiss the LIFE Club as a named plaintiff in this lawsuit.

To resolve this question, the Court refers to the Federal Rules of Civil Procedure, which provide, in relevant part, that:

> [C]apacity to sue or be sued shall be determined by the law of the state in which the district court is held, except ... that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States.

Fed.R.Civ.P. 17(b). Massachusetts law allows an unincorporated association to sue on its own behalf through named representatives, provided that the representatives "will fairly and adequately protect the interests of the association and its members." Mass. R. Civ. P. 23.2. The named student plaintiffs in this suit have interests that parallel the interests of the LIFE Club; their attorney has argued the issues pertinent to both the members and the Club. Thus, the Court finds that the named plaintiffs, as representatives of the Club, can fairly and adequately protect the interests of the Club and its members.

Moreover, the LIFE Club, as represented by the named student plaintiffs, appears keenly and exclusively suited to protecting the interests of its future members, who hope to participate in the Club's candy cane and other distribution activities long after the individually-named student plaintiffs have graduated Westfield High School. *See Patriot Party of Allegheny County v. Allegheny County Dept. of Elections,* 95 F.3d 253 (3d Cir.1996) (finding freedom of association under First and

Fourteenth Amendments to extend to partisan political party and holding that party had legal standing to challenge state regulations allegedly infringing on that right).

The Court finds the LIFE Club to be a properly named plaintiff and will deny the defendants' request to dismiss the Club from this lawsuit. The Court grants the plaintiffs leave to amend the verified complaint to reflect that the LIFE Club is represented by and through its members, the named student plaintiffs.

#### 2. *Ripeness*

■ The defendants also argue that the plaintiffs' claims are unripe for adjudication. First, the school argues that no harm has occurred, since the students ignored the school's decision and handed out their messages anyway. Thus, their speech was not suppressed. Secondly, the school notes that Superintendent McDowell has stayed the plaintiffs' suspensions and has yet to decide whether to impose the suspensions. Thus, the school maintains, any harm occurring to the plaintiffs is, as yet, speculative.

The school ignores that policies prohibiting free speech create immediate harms. As the Supreme Court has declared in no uncertain terms: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). It simply does not matter that the school has yet to impose the penalties for violation of speech policies; these plaintiffs are harmed to the extent the policies in effect suppress their free speech. *See id.* (threatening or impairing First Amendment interests at time relief is sought is sufficient injury). Because the plaintiffs allege an actual harm, these plaintiffs need not await Superintendent McDowell's perpetually-impending decision.

#### 3. *Exhaustion of Administrative Procedures*

The defendants present one additional argument for preventing the plaintiffs from arguing the merits of this case, positing that the plaintiffs have failed to exhaust the administrative procedures provided by the Westfield Public Schools in the Student Handbook. If this lawsuit involved the simple matter of "discretionary school discipline," then the Court would be profoundly inclined to "defer to the 'expertise' of the school authorities and remand the plaintiff[s] to [their] administrative remedies within the school hierarchy." *Quarterman v. Byrd*, 453 F.2d 54, 56 (4th Cir.1971). This lawsuit, however, involves significant questions of statutory and constitutional law, the answers to which this Court is inherently entrusted with deciding. *See id.* Accordingly, the Court will deny the defendants' request to dismiss the case on these grounds.

### B. *Preliminary Injunction*

#### 1. *Likelihood of Success on the Merits*

To obtain a preliminary injunction, the plaintiffs must demonstrate that they have a substantial likelihood of prevailing on the merits of their claims. *See McGuire*, 260 F.3d at 42. The plaintiffs assert four legal grounds which they believe demonstrate their substantial likelihood of success on the merits. *See id.* The plaintiffs argue that the school's speech policies are unconstitutional prior restraints on speech. *See Riseman v. Sch. Comm. of the City of Quincy*, 439 F.2d 148, at 149–50 (1st Cir. 1971) (invalidating school policies that failed to provide substantive criteria and procedural constraints to minimize the effects of prior restraint on student speech). The plaintiffs also assert that the school's

speech policies are unconstitutional content-based restrictions, *see Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), are unconstitutionally vague, *see Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926), and violate the Massachusetts Students' Freedom of Expression Law, *see* Mass. Gen. Laws ch. 71, § 82. Each of these legal grounds implicate, in one way or another, the principles articulated in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, where the Supreme Court struck down a school policy because the school failed to demonstrate that the student expression forbidden by the policy "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (internal quotations omitted).

The defendants take the opposite position, arguing that the school has extensive authority to regulate the manner of student expression because the LIFE Club is a school-sponsored organization. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271–73, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) ("educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in *school-sponsored* expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.") (emphasis added).

The Court first turns to the plaintiff's state law arguments. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

### a. Massachusetts Students' Freedom of Expression Law

The plaintiffs argue that the school applied its policies in violation of the Massachusetts Students' Freedom of Expression Law ("Act"). *See* Mass. Gen. Laws ch. 71, § 82.

### i. The Act

In its entirety, the Act provides:

*The right of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder within the school. Freedom of expression shall include without limitation, the rights and responsibilities of students, collectively and individually,* (a) to express their views through speech and symbols, (b) *to write, publish and disseminate their views,* (c) to assemble peaceably on school property for the purpose of expressing their opinions. Any assembly planned by students during regularly scheduled school hours shall be held only at a time and place approved in advance by the school principal or his designee.

No expression made by students in the exercise of such rights shall be deemed to be an expression of school policy and no school officials shall be held responsible in any civil or criminal action for any expression made or published by the students. For the purposes of this section and sections eighty-three to eighty-five, inclusive, the word student shall mean any person attending a public secondary school in the commonwealth. The word school official shall mean any member or employee of the local school committee.

Mass. Gen. Laws ch. 71, § 82 (emphasis added). The Massachusetts Supreme Judicial Court ("SJC") has held that the

Act's "clear and unambiguous language protects the rights of secondary school students limited only by the requirement that any expression be non-disruptive within the school." *Pyle v. Sch. Comm. of S. Hadley,* 423 Mass. 283, 667 N.E.2d 869, 872 (1996) ("There is no room in the statute to construe an exception for arguably . . . offensive language absent a showing of disruption within the school.").

■ The plaintiffs cite *Pyle* for the proposition that Massachusetts law enshrines the *Tinker* "substantial disruption" test. *See id.* In *Pyle,* the SJC stated that the parties agreed that the drafters of the Act intended to codify *Tinker,* but the SJC did not explicitly endorse that argument. *See id.* What the SJC did emphasize explicitly, however, was that the Act is "unambiguous and must be construed as written." *Id.* Turning to the plain language of the statute, free speech is permitted to the extent it does not cause "*any* disruption or disorder within the school." *See* Mass. Gen. Laws ch. 71, § 82 (emphasis added). On the other hand, *Tinker* permits free speech to the extent it does not cause *material* disruption or *substantial* disorder or invasion of the rights of others. *See Tinker,* 393 U.S. at 513, 89 S.Ct. 733. No Massachusetts state court decision has yet explored factually what constitutes "*any* disruption or disorder" within a school. The obvious purpose of the statute, to protect student speech, would be completely undermined, however, if "any disruption or disorder" extended to include

trivial or merely negative reactions to an unpopular viewpoint.[11]

A reasonable construction of the Act would also interpret the adjective "any" to include "prospective" disruption or disorder. A school administrator does not have to wait until disorder or disruption actually ensues; in certain circumstances, a school administrator must be able to prevent disorder or disruption. Thus, a school administrator may, under the Act, deny a student permission to distribute literature before such distribution occurs, but only if the administrator, considering all circumstances known at the time of his or her decision, reasonably forecasts that "any disruption or disorder" will ensue within the school because of the distribution.

### ii. *Disruption and Disorder*

■ From the evidence before the Court, it appears unlikely that Principal Daley and Superintendent McDowell reasonably forecasted that any disruption or disorder would result within the school because of the candy cane distribution. The previous distribution of candy canes with the secular message in December 2001 apparently resulted in no disruption or complaints. Furthermore, there is no evidence before the Court to suggest that there are tensions within Westfield High that might be incited by the distribution of this religious material. At oral argument, defendants' counsel suggested that Principal Daley could not trust a student's word not to pass things out in class, and therefore, reasonably forecasted that the distri-

---

**11.** In analyzing the plaintiffs' likelihood of success on their state law claim, the Court will assume without deciding that the Act's "any disruption or disorder" standard is easier for the defendants to show than *Tinker's* "substantial disruption or material interference" standard, keeping in mind, however, that *Tinker* provides students with a constitutional floor with regard to private speech.

Even under this more school-favorable standard, the defendants cannot prevail, given the facts of this case.

This mode of analysis considers "potentially dispositive state-law challenges" before reaching "ultimate constitutional questions." *City of Chicago v. Int'l College of Surgeons,* 522 U.S. 156, 188, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (Ginsberg, J., dissenting).

bution would result in disruption or disorder. The Court is disinclined to accept this gross stereotype as an valid justification, since Principal Daley could have made his conditions clear (i.e., allow distribution only during non-instructional time) rather than deny permission altogether. Furthermore, such an excuse would justify suppression of nearly all student speech for the simple reason that, if the speech was to occur in the classroom during instructional time, it would most likely be disruptive because it would draw attention away from instruction.

At oral argument, defendants' counsel also suggested that when the plaintiffs approached Principal Daley, he had no idea that they were requesting permission to distribute during non-instructional time. The plaintiffs' failure to suggest reasonable accommodations, however, is immaterial, since it is the school administrator who, although deciding whether to grant a student permission to distribute, must not abridge the "right of students to freedom of expression in public schools," Mass. Gen. Laws ch. 71, § 82, and is, therefore, the one responsible for suggesting reasonable accommodations. A students' free speech rights should not hinge upon how he or she words the question ("Can I pass out candy canes?" versus "Can I pass out candy canes during non-instructional time in a manner that will not cause any disruption or disorder within the school?"), especially when it is the school administrator who is more likely to possess a working knowledge of school policies and the law. On this evidence, it appears the defendants did not make a reasonable forecast of any disruption or disorder.

The defendants argue that the in-class distributions actually caused disruption and disorder. At oral argument, counsel pointed to plaintiff Stephen Grabowski's in-class distribution during which he said,

he "could get suspended for this," as clear evidence of his intent to incite a disruption in Mr. Rivera's Spanish class and to direct the students' attention from Spanish to his particular religious cause. The plaintiffs view this incident differently. Most notably, they point out that Mr. Rivera mentions no disruption occurring due to the distribution in his affidavit. The in-class distributions were made prior to the actual start of teaching and with the express, though uninformed, permission of the presiding teacher. It is also apparent, the plaintiffs maintain, that only a small proportion of the 450 total candy canes distributed were actually distributed in-class, and then again, only by two of the six student plaintiffs, and once more, during non-instructional time. This, the plaintiffs contend, suffices to show the plaintiffs did not disrupt that class.

While the proportion of incidents of disruption to candy canes distributed is an irrelevant calculation, at this point, the Court is initially inclined to agree that no actual disruption or disorder occurred as a result of the in-class distribution. While the plaintiffs have the ultimate burden of persuasion in this motion for a preliminary injunction, nothing in the evidence currently before the Court supports the defendants' claim that those classes were disrupted.

There is nothing in the evidence before the Court to suggest that other students were not free to decline the candy canes, that the student plaintiffs coerced others into accept their message, that the student plaintiffs invaded the rights of others not to receive literature by, for example, stuffing lockers, or that the student plaintiffs blocked other students from entering class, actions which could constitute even substantial interference and justify restricting distribution to a more reasonable time, manner, and place. *Cf. Slotterback*

*v. Interboro Sch. Dist.*, 766 F.Supp. 280, 297–98 (finding genuine issue of material fact whether school officials had reason to anticipate *substantial* interference with school work where students distributed literature during class and in a manner that blocked access to class which made others late, where other students read the literature during classroom instruction, and where students littered hallways with the material in a way suggesting they were not merely discarded but intended to litter). Instead, the uncontroverted evidence shows that those students finding the LIFE Club's religious messages disagreeable merely set the messages aside and enjoyed a minty treat for their troubles.

Especially telling, however, is the notable absence in Mr. Rivera's affidavit of a statement that his instruction or the students' study was interrupted by the distribution. One student's isolated statement that he might get suspended for his actions may be evidence of defiance, but without more, is not evidence of the type of disruption or disorder that the Act contemplates. As such, the Court believes that the plaintiffs are substantially likely to succeed on their state law claim that the school applied its speech policies in violation of Mass. Gen. Laws ch. 71, § 82, because it appears that the defendants prohibited student speech without a reasonable forecast of any disruption or disorder and it seems that no disruption or disorder actually occurred.

### iii. *Constitutional Defenses*

The defendants read *Hazelwood* as giving a school the right, and as imposing an obligation onto the school, to supervise the dissemination of student-originated but school-sponsored works. *See Hazelwood,* 484 U.S. at 271, 108 S.Ct. 562 ("Educators are entitled to exercise greater control" over school-sponsored forms of student expression.). Thus, the argument goes, while the Act makes no distinction between school-tolerated and school-sponsored speech, *Hazelwood* forecloses the possibility that the Act strips away from the school this right to supervise school-sponsored expressive activities.[12]

The defendants also question the Act's constitutionality under the Establishment Clause of the United States Constitution. The defendants urge that, if the Court were to find the plaintiffs' expressive activities to constitute school-sponsored speech under *Hazelwood* rather than school-tolerated speech under *Tinker,* then the school's actions would likely violate the Establishment Clause. *See Rusk v. Crestview Local Schs.*, 220 F.Supp.2d 854 (N.D.Ohio 2002) (finding elementary school policy allowing non-profit groups to submit and have school officials disseminate flyers advertising, *inter alia,* church events and religious activities to students to violate Establishment Clause).

The defendants further question whether the Act's provision granting schools immunity from liability for students' expressive conduct would continue to offer Westfield High true solace in the face of future lawsuits. The Act's promise of absolute immunity is illusory, as the Supremacy Clause prevents Massachusetts from limiting remedies provided by federal law as, for instance, under 42 U.S.C. § 1983 for violations of the Establishment Clause. *Cf. Kimes v. Stone,* 84 F.3d 1121, 1127 (9th Cir.1996) (Supremacy Clause prevents application of state litigation im-

---

12. While the Court need not reach the merits of this argument, it is worth noting that the Commonwealth of Massachusetts certainly has the power and ability, through legislation, to surrender voluntarily any right a public high school may have to censor student speech.

munity laws to Section 1983 claim); *Yeo v. Town of Lexington*, 131 F.3d 241, 249 n. 3 (1st Cir.1997) (Massachusetts Students' Freedom of Expression Law provision not determinative of constitutional question of what constitutes "state action").

Because the Establishment Clause applies only to government and not private action, *see* U.S. Const., Amdt. 1; *Rivera v. East Otero Sch. Dist.*, 721 F.Supp. 1189, 1195 (D.Colo.1989), this Court must decide whether the LIFE Club's distribution activities concern *private, school-tolerated speech*, which is entitled to greater First Amendment protections, *see Tinker*, 393 U.S. 503, 89 S.Ct. 733, or *school-sponsored speech* that, because it is related to curriculum and may reasonably be perceived as bearing the imprimatur of the school, is subject to the school's reasonable restrictions, *see Hazelwood*, 484 U.S. 260, 108 S.Ct. 562, and may, in some circumstances, violate the Establishment Clause. Thus, the Court finds it appropriate to decide which framework, *Tinker* or *Hazelwood*, provides the overarching principles that guide the resolution of this case.[13]

b. *Private Speech Versus School–Sponsored Speech*

It is now textbook law that when Sharon Sitler walked onto the grounds of Westfield High School the day she shared candy canes and religious messages with her fellow students, she carried constitutional rights to free speech and expression with her. *See Tinker*, 393 U.S. at 506, 89 S.Ct. 733. Undoubtedly, the First Amendment protects the peaceful distribution of literature.[14] *See United States v. Grace*, 461 U.S. 171, 176, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (leafletting is an expressive activity involving "speech" protected by the First Amendment); *Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943) (First Amendment encompasses the right to distribute and receive literature). First Amendment protections also extend to religious speech. *See Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). The scope of Sharon's constitutional rights on school grounds, however, is not coterminus with the constitutional rights of adults in other settings. *See, e.g., Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (upholding school's punishment of student who delivered speech laden with sexual innuendo at high school assembly); *Hazelwood*, 484 U.S. at 266, 108 S.Ct. 562. The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials,

---

**13.** The hierarchy of speech in school settings can be delineated into three tiers, built up from the most restrictable to the least: The bottom tier consists of *government speech* (i.e., a principal speaking at a school assembly) over which the government may exercise unfettered control over content; the middle tier consists of *school-sponsored speech* (i.e., a teacher editing a curriculum-based newspaper that is a part of a journalism class) over which the school may exercise control over content because the speech might reasonably be perceived as bearing the imprimatur of the school and because it involves pedagogical interests; the top tier consists of *private, school-tolerated speech* (i.e., student speaking to another during lunch break) which may be controlled to the extent it substantially disrupts or materially interferes with the school's disciplinary concerns. *See Fleming v. Jefferson County Sch. Dist. R–1*, 298 F.3d 918, 923–24 (10th Cir.2002). The parties argue that this case falls somewhere between the top two levels.

**14.** The First Amendment applies to states by operation of the Due Process Clause of the Fourteenth Amendment. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n. 1, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996).

consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507, 89 S.Ct. 733. Thus, the Court must demarcate the scope of Sharon Sitler's constitutional rights "in light of the special characteristics" of the Westfield High School environment. *Id.* at 506, 89 S.Ct. 733.

The school defends its speech policies on the premise that the LIFE Club is "school-sponsored," a status which would require this Court to conduct forum analysis and apply the appropriate level of scrutiny relevant to the particular forum. *See Hazelwood*, 484 U.S. at 273, 108 S.Ct. 562 (finding school-sponsored newspaper to be limited public forum, thus allowing school to regulate contents of newspaper in ways "reasonably related to pedagogical concerns"). *Compare, e.g., Rivera*, 721 F.Supp. at 1193 ("The holding in *Tinker* did not depend upon a finding that the school was a public forum."). Any student group meeting on school premises may arguably be characterized as school-sponsored, but the Court must look beyond carelessly strewn labels and examine the substance of the relationship between the LIFE Club's activities and the school.

In *Hazelwood*, the Supreme Court examined "the extent to which educators may exercise editorial control over the contents of a high school newspaper produced as part of the school's journalism curriculum." *Hazelwood*, 484 U.S. at 262, 108 S.Ct. 562. In that case, a school principal denied students permission to publish two articles in the school newspaper. One article dealt with the topic of student pregnancy within the school; the principal objected because the article insufficiently disguised the identity of the pregnant students in the article. *See id.* at 263, 108 S.Ct. 562. The other article dealt with the topic of divorce in which an identified stu-

dent made negative comments regarding his parents' divorce; the principal objected because the article did not include a response from the identifiable parent, who was given no opportunity to respond. *See id.* Because there was no time to change the layout of the newspaper before printing, the pages on which the articles were located were deleted completely. *See id.* at 275, 108 S.Ct. 562.

■ In upholding the school's decision to censor the articles, the Supreme Court found the school "reserved the forum for its intended purpose, as a supervised learning experience for journalism students." *Id.* at 270, 108 S.Ct. 562 (internal quotations and citations omitted). Numerous facts supported the conclusion that the newspaper was a school-sponsored activity. The school district funded the newspaper on an annual basis, providing money for printing and other incidental costs, which included the costs of supplies, textbooks, and a portion of the journalism teacher's salary. *See id.* at 262–63, 108 S.Ct. 562. More importantly, the newspaper was sufficiently linked to the curriculum: Students participated in the newspaper as part of a graded, for-credit, academic course; the journalism teacher made all decisions regarding content, editing, scheduling deadlines, choosing editors, assigning stories, and dealing with the printing company, and the teacher made most of these decisions without consulting the students; the school principal reviewed and approved each article for publication. *See id.* at 268–69, 108 S.Ct. 562. The school also reserved a strong pedagogical interest in ensuring the articles maintained a certain level of "responsible journalism" and journalistic integrity taught in the classes. *See id.* at 269, 108 S.Ct. 562. Because the newspaper was school-sponsored, the Supreme Court held that "school officials were entitled to regulate

the contents of [the newspaper] in any reasonable manner." *Id.* at 270, 108 S.Ct. 562 (internal quotations omitted), 274–76, 108 S.Ct. 562 (also finding the school's actions reasonable). The Supreme Court elaborated:

Educators are entitled to exercise greater control over this ... form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.

*Id.* at 271, 108 S.Ct. 562. Thus, when a school lends "its name and resources to the dissemination of student expression," *Tinker* standards are inapplicable.[15] *Compare Hazelwood*, 484 U.S. at 272–73, 108 S.Ct. 562 *with Burch v. Barker*, 861 F.2d 1149, 1159 (9th Cir.1988) (applying *Tinker* principles to unauthorized student newspaper that was not school-sponsored).

In so ruling, the Supreme Court clearly distinguished *Hazelwood* from the situation in *Tinker*. The Supreme Court explained that *Hazelwood* dealt with schools affirmatively "promoting particular student speech" and,

educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

*Hazelwood*, 484 U.S. at 270–71, 108 S.Ct. 562. In contrast, the Supreme Court noted, *Tinker* dealt with "educators' ability to silence a student's personal expression that happen[ed] to occur on the school premises," *id.* at 271, 108 S.Ct. 562.

*Tinker* concerned the constitutionality of a school's actions in punishing students who came to school refusing to take off black arm bands worn in protest of the hostilities in Vietnam in violation of a newly adopted school policy. *Tinker*, 393 U.S. at 504, 89 S.Ct. 733. The school feared that allowing students to wear the armbands would result in a disturbance among the students. *See id.* at 508, 89 S.Ct. 733. Finding "no evidence whatever of [the students'] interference, actual or nascent, with the schools' work or of collusion with the rights of other students to be secure and to be let alone," the Supreme Court declared that a school's unsubstantiated apprehension of disruption is insufficient justification for suppressing students' rights to free speech in schools:

[I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up

---

**15.** The Court will explicate the *Tinker* standards momentarily.

and live in this relatively permissive, often disputatious, society.

*Tinker*, 393 U.S. at 508–09, 89 S.Ct. 733 (citations omitted). The Supreme Court reaffirmed the strong First Amendment protections pertaining to students who engage in private speech which merely happens to occur on school grounds and which does not "substantially interfere with the work of the school or impinge upon the rights of other students." *Id.* at 509, 89 S.Ct. 733.

> The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. A student's rights, therefore, do not embrace merely the classroom hours. When he [or she] is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he [or she] may express his [or her] opinions, even on controversial subjects like the conflict in Vietnam, if he [or she] does so without "materially and substantially interfering with the requirements of appropriate discipline in the operation

of the school" and without colliding with the rights of others.

*Tinker*, 393 U.S. at 512–13, 89 S.Ct. 733 (citations and footnotes omitted).

■■■ Turning these principles to the evidence now before the Court, the school's contention that the LIFE Club is a school-sponsored organization whose literature distribution bears the "imprimatur of the school" is unpersuasive.[16] The mere facts that the school opened its channels of communication (i.e., daily bulletin, bulletin boards, student yearbook), provided an adult sponsor who acts merely as a monitor and does not actively or substantively participate in any of the Club's activities, and opened its facilities for use before school for morning prayer at the flagpole and after school for Club meetings, does not mean that the LIFE Club can "fairly be characterized as part of the school curriculum."[17] *Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562. To adopt the defendants' definition of "school-sponsored" would devoid that term of any helpful meaning, as nearly every student group activity happening to occur on school grounds can, in some tenuous sense, be described as using school facilities and as designed to impart some sort of knowledge upon its members. Rather, for expressive activity to be school-sponsored, the school needs to take

---

**16.** The parties do not dispute the evidence relating to the Club's activities within the school; the parties only dispute whether that evidence shows that the Club's activities are private or school-sponsored.

**17.** Although the school colors its accommodations to the LIFE Club as a display of its voluntary generosity to provide access to school facilities, when considering the open access the school has apparently granted to other, arguably similar, non-curriculum related student groups (i.e., C.O.P.E., S.A.D.D., Key Club, Young Democrats Club, Young Republicans Club, Improv), it is likely that the school is obligated by the Constitution, *see Good News Club*, 533 U.S. 98, 121 S.Ct. 2093,

150 L.Ed.2d 151; *Prince v. Jacoby*, 303 F.3d 1074, 1090–92 (9th Cir.2002), and is heavily encouraged by statute, *see* Equal Access Act, 20 U.S.C. § 4071 *et seq.*, to provide the LIFE Club similar access to school facilities and related resources. Additionally, denying the LIFE Club official school recognition would violate the Equal Access Act, if such a designation would allow the Club to be "part of the student activities program" and to have access to the school bulletin, school bulletin boards, and the public address system. *See Bd. of Educ. of Westside Comm. Schs. v. Mergens*, 496 U.S. 226, 247, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990).

affirmative steps in promoting the particular speech. *See Slotterback*, 766 F.Supp. at 290 ("*Hazelwood* involved *student access to state action* in a way *Tinker* did not.") (emphasis added); *Clark v. Dallas Indep. Sch. Dist.*, 806 F.Supp. 116 (N.D.Tex.1992) (finding student passing out religious tracts to be private, not school-sponsored, speech).

Unlike the newspaper and journalism classes in *Hazelwood*, no evidence ties the LIFE Club's activities to the school's curriculum.[18] The school does not fund the Club; the Club's activities are not directly related to any subject taught in any course that the school offers; the school does not require any student to participate in the group; the school does not give Club members academic credit for participation in the LIFE Club. *Compare Hazelwood*, 484 U.S. at 262–63, 268–69, 108 S.Ct. 562. *Cf. Bd. of Educ. of Westside Comm. Sch. v. Mergens*, 496 U.S. 226, 251, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (defining "noncurriculum related student group" under the Equal Access Act similarly), 259 (Congress formulated the Equal Access Act in 1984 "against the background protections of the Free Speech Clause, as well as the Establishment and Free Exercise Clauses") (Kennedy, J., concurring).

In this age of Congressional mandates requiring schools to either provide equal access to diverse student groups or risk losing federal funding,[19] *see* Equal Access Act, 20 U.S.C. §§ 4071 *et seq.*, a member of the public cannot perceive the actions of every single student group that uses school facilities to bear the "imprimatur of the school" and expect those perceptions to be reasonable. *Compare Hazelwood*, 484 U.S. at 270–71, 108 S.Ct. 562 (activities that are truly school-sponsored "might reasonably be perceived to bear the imprimatur of the school"). As the Supreme Court has posed bluntly, "[t]he proposition that schools do not endorse everything they fail to censor is not complicated." *Mergens*, 496 U.S. at 251, 110 S.Ct. 2356.

The defendants' reliance on *Walz v. Egg Harbor Township Bd. of Educ.*, 187 F.Supp.2d 232 (D.N.J.2002) is similarly misplaced. The plaintiff in *Walz* was an elementary school student who sought to distribute religious gifts to his pre-kindergarten, kindergarten, and first grade classmates during in-class, school-sponsored winter holiday parties. *See id.* at 234–35. The gifts were pencils with the message "Jesus the Little Children" imprinted on them, *see id.* at 234, and candy canes with nearly the same religious messages attached to them as the candy canes which the plaintiffs in this case distributed. *Compare Walz*, 187 F.Supp.2d at 235 n. 2

---

**18.** As the United States as *amicus curiae* has suggested, if the Court were to accept the school's proposition that LIFE Club is a school-sponsored, curriculum-related group, then the school would be in flagrant violation of forty years worth of Supreme Court precedent barring school-sponsored prayer and devotional activities. *See, e.g., Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (holding daily classroom prayer unconstitutional); *Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (holding daily bible reading unconstitutional). Ironically, defendants' counsel at oral argument suggested establishment of religion was the very result the school officials sought to avoid in the first place when they refused to grant the LIFE Club permission to pass out the candy canes with religious message. *Cf. Johnston–Loehner v. O'Brien*, 859 F.Supp. 575, 580 (M.D.Fla.1994) ("Indeed, rather than preventing violation of the Establishment Clause, the policy itself violates that clause.").

**19.** The Supreme Court has found that granting access to school facilities during non-instructional time to a religious group under the Equal Access Act does not violate the Establishment Clause. *See Mergens*, 496 U.S. 226, 110 S.Ct. 2356.

("A Candy Maker's Witness") *with* Defendants' Mem. (Doc. No. 26), Exhibit A, at 2 (message attached to candy canes). While the school disallowed the plaintiff to distribute his religious presents during the in-class, school-sponsored winter holiday party for fear that the young students and their parents "might be confused as the school's endorsement of the religious message," *id.* at 234, the school offered what the district court found to be a reasonable accommodation: the school allowed the student to distribute his gifts before school, during recess, and after school, *see id.* at 235.

The district court in *Walz* considered the constitutionality of numerous policies which the school used to justify its decision. The first provided in part: "no religious belief or nonbelief shall be promoted in the regular curriculum or in district-sponsored courses, programs, or activities, and none shall be disparaged." *Id.* at 234. This policy also recognized that exposing students to various cultural and religious societies, "if presented in an objective manner and as a traditional part of the culture and religious heritage of the particular holiday," would further broaden the students' secular education. *Id.* The second policy concerned gift-giving. *See id.* at 236. Anyone wishing to distribute gifts at school was supposed to donate the gifts to the Parent Teacher Organization, which would, in turn, distribute the gifts to students at the seasonal event. *See id.* "Direct gifts from students [were] discouraged because of the potential economic strain on certain students and the potential emotional distress if a particular student were to be excluded from the direct gift-giving." *Id.* The policy also prohibited distribution of items with corporate, political, union, or religious messages in any class during school hours. *See id.* This policy was to ensure no one confused the origin of the message or mistakenly be-

lieved that the school endorsed any particular message. *See id.*

The parties did not dispute that "the pre-kindergarten, kindergarten, and first grade public classrooms where the alleged constitutional violations transpired are non-public forums, in which school officials can reasonably restrict the speech of students and teachers." *Id.* at 238. The district court also found that the school's seasonal in-class parties "were school events intended to promote sharing and caring among students, to develop social skills, and to learn about talking in turn when in a large group." *Id.* at 239.

Consequently, the case at hand is completely distinguishable from *Walz* in two important ways. First, the in-class, school-sponsored holiday party in *Walz*, despite its festivities, concerned literature distribution during pure instructional time. Courts are more differential when schools shape the bounds of their curriculum, *see Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562 (school-sponsored newspaper as part of journalism classes); *Bethel*, 478 U.S. at 683–86, 106 S.Ct. 3159 (school-sponsored assembly as part of educational program in self-government), *Walz*, 187 F.Supp.2d at 241 (school-sponsored holiday that was "meant to have an educational component" and was "highly structured, supervised, and regulated"), than when schools try to shape the bounds of private speech that occurs during non-instructional time between classes, during recess, in the cafeteria, on the playing field, or other designated "free time" during the school day, *see Tinker*, 393 U.S. at 512–13, 89 S.Ct. 733. Contrary to the spin the defendants put on the plaintiffs' actions in this case, this case appears only to concern the distribution of religious messages during non-instructional time which amounts to private, school-tolerated speech.

Secondly, the students ·in *Walz* were highly immature and impressionable elementary school students "celebrating at an in-class party." *Walz*, 187 F.Supp.2d at 240. The district court recognized the situation to be "different than high school students independently expressing political beliefs," *see id.* (referring to *Tinker*); here, it is quite apparent that high school students independently expressed their religious beliefs. Again and again, the Supreme Court has professed its confidence that high school students have the capacity to understand that a school does "not endorse or support student speech that it merely permits on a nondiscriminatory basis." *Mergens*, 496 U.S. at 247–52, 110 S.Ct. 2356.

Viewing the evidence before the Court, it is apparent that the LIFE Club is a student-initiated, student-led organization whose activities are unrelated to Westfield High's curriculum or other, related activities; as such, distributing the religious messages attached to the candy canes constitutes an exercise of wholly private speech that merely happened to have occurred on school grounds and does not constitute school-sponsored speech. The Supreme Court's holding in *Hazelwood* appears to have no more than a general bearing on this case.

### c. Establishment Clause Concerns

Because the candy cane distributions are private expressive activities, the school has

no basis for arguing that, by allowing the candy cane distribution, it is affirmatively promoting religion in violation of the Establishment Clause.[20] At the heart of the school's argument lies a widely held misconception of constitutional law that has infected our sometimes politically overcorrect society: The Establishment Clause does not apply to private action; it applies only to government action. *See* U.S. Const., Amdt. 1; *Rivera*, 721 F.Supp. at 1195. Because the LIFE Club's activities are private, school-tolerated (rather than school-sponsored) expressive activities, the Establishment Clause only works against the defendants. *See Rivera*, 721 F.Supp. at 1195 (finding students' distribution of non-student, religious newspaper to constitute private expressive action which implicated no Establishment Clause concerns); *Johnston–Loehner v. O'Brien*, 859 F.Supp. 575, 580 (M.D.Fla.1994) ("rather than preventing violation of the Establishment Clause, the [school] policy itself violates that clause").

The Court will now turn to the constitutional validity of the school's policies as written.

### d. · Content–Based Restrictions

■ The plaintiffs contend that Westfield High's speech policies are content-based restrictions that are unconstitutional, both facially and as applied.[21] Because

---

**20.** Westfield High's "fear of a mistaken inference of endorsement is largely self-imposed, because the school itself has control over any impressions it gives its students." *Mergens*, 496 U.S. at 251, 110 S.Ct. 2356. To eliminate all doubt, however unreasonable, the school could make clear in its Student Handbook that it does not endorse the views of students simply by allowing them to disseminate information or the views of student organizations simply by officially recognizing them or allowing them to conduct expressive activities on school premises. *See id.* ("students will

reasonably understand that the school's official recognition of the club evinces neutrality toward, rather than endorsement of, religious speech.")

**21.** Unfortunately, the language used in the jurisprudence and in the parties' arguments can be confusing. Content-based restrictions come in various types, including those that restrict certain subject-matter and those that restrict certain viewpoints. Courts and parties often refer to subject-matter restrictions as simply content-based restrictions. To al-

the Court already decided that the plaintiffs are substantially likely to prevail on their state law claim challenging the application of the school's policies, the Court need not also consider the constitutionality of that application. *See Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 157, 104 S.Ct. 2267, 81 L.Ed.2d 113 (1984) (The "fundamental rule of judicial restraint" dictates that a court "will not reach constitutional questions in advance of the necessity of deciding them."). To bring a successful facial challenge to the constitutionality of the policies, the plaintiffs must show that, "even if one or more valid application exists," the reach of the school policies "is so elongated that it threatens to inhibit constitutionally protected speech." *McGuire*, 260 F.3d at 47.

### i. *Subject–Matter–Based Restriction*

The first issue the Court must resolve is whether the school's policies as written are based on subject-matter. Undoubtedly, the policies as written require an administrator to review the contents of literature sought to be distributed before approving the distribution. The Free Speech policy allows for only "responsible speech"; the Distribution Policy allows distribution only upon an administrator's approval; neither contains criteria which might guide the administrator's decision. The Distribution Policy Regarding Literature Unrelated to Curriculum disallows distribution of any non-curriculum related literature. Thus, the policies on their face are subject-matter based, because they require administrators to review and evaluate the subject-matter of the literature before granting approval to distribute.

### ii. *Viewpoint–Based Restriction*

The plaintiffs also contend that the school speech policies are viewpoint-based as written. *See Good News Club*, 533 U.S. at 107, 121 S.Ct. 2093, *Cornelius v. NAACP Legal Def. and Educ. Fund*, 473 U.S. at 806, 105 S.Ct. 3439 ("the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he [or she] espouses on an otherwise includible subject").

In *Lamb's Chapel*, a school permitted outside organizations to use its facilities during after-school hours for "social, civic, or recreational uses," but not for "religious purposes." *Lamb's Chapel*, 508 U.S. at 387, 113 S.Ct. 2141. A religious group sought access to school facilities to show a film about child rearing from a religious perspective. *See id.* at 388–89, 113 S.Ct. 2141. The school denied the group access to show the film, because it was "church related." *Id.* Because a film about child rearing contained subject matter otherwise permissible under the school's policies permitting activities with "social, civic, or recreational" value, the Supreme Court held that the school discriminated against the group's particular viewpoint, that being the religious perspective. *See id.* at 393–94, 113 S.Ct. 2141.

Likewise in *Good News Club*, the school granted access to outside groups that "[promoted] the moral and character development of children." *Good News Club*, 533 U.S. at 108, 121 S.Ct. 2093. The school denied the Good News Club, a Bible club, the same access as it had to other organizations simply because the Good News Club's activities were equivalent to religious worship and therefore impermissible under the community's policies. *See id.* at 103, 121 S.Ct. 2093. Because the

leviate confusion, the Court will use the term subject-matter based restriction, since it is a

subset of the larger category of content-based restriction.

subject matter of the Good News Club's activities was otherwise permissible as they promoted the moral and character development of children, the Supreme Court held that the schools' exclusion of the Good News Club constituted impermissible viewpoint discrimination. *See id.* at 110, 121 S.Ct. 2093.

Here, the policies on their face allow only speech that is "responsible" or curriculum-related. While the policies reserve tremendous discretion to administrators, on their face the policies do not appear to discriminate against any particular viewpoint. *Compare Good News Club,* 533 U.S. at 110, 121 S.Ct. 2093; *Lamb's Chapel,* 508 U.S. at 387, 113 S.Ct. 2141. Therefore, it is unlikely that the plaintiffs will succeed on the claim that the policies are viewpoint-based on their face.

### iii. *Forum Analysis*

■ Normally, a court analyzing the constitutionality of a subject-matter-based, viewpoint-neutral restriction on speech must first determine the type of forum to which access is sought and then apply the appropriate level of scrutiny appropriate to the type of forum. *See Lamb's Chapel,* 508 U.S. at 390–92, 113 S.Ct. 2141; *Cornelius* 473 U.S. at 801–08, 105 S.Ct. 3439; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The *Tinker* court did not need to engage in forum analysis because the school policy at issue was viewpoint-based rather than subject-matter based. See *Perry,* 460 U.S. at 49 n. 9, 103 S.Ct. 948 (*Tinker* "did not involve

the validity of an unequal access policy but instead an unequivocal attempt to prevent students from expressing their viewpoint on a political issue.") (emphasis added). In *Tinker,* the school's policy prohibiting armbands was directly aimed at curtailing speech in protest against the hostilities in Vietnam; the policy did not extend to expressions of speech pertaining to the opposite viewpoint, namely, expression in support of the war effort. See *Tinker,* 393 U.S. at 504, 89 S.Ct. 733. Viewpoint-based restrictions on speech are per se unconstitutional, irrespective of the forum, *see, e.g., Cornelius,* 473 U.S. at 806, 811, 105 S.Ct. 3439, therefore making it unnecessary for the Supreme Court to reach the forum issue.

Some courts have refrained from applying forum analysis in other circumstances and held that, where private student speech occurs on school grounds during school hours, forum analysis is unneeded in determining the constitutionality of any type of content-based restriction.[22] *See Slotterback* 766 F.Supp. at 290–91, n. 9–10 (citing cases); *Rivera,* 721 F.Supp. at 1193. This Court agrees with that mode of inquiry. Forum analysis is "a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439. Private speech, in the form of "personal intercommunication among the students," can be counted as one of the specific purposes to which schools are dedicated. *Tinker,* 393 U.S. at 512, 89 S.Ct.

---

**22.** This Court notes, however, that some of the cases to which the *Slotterback* court refers have avoided forum analysis for the simple reason that those courts did not base their holdings upon a finding of a subject-matter-based restriction. *Compare, e.g., Tinker* (not applying forum analysis to viewpoint-based restriction); *Burch* (not applying forum analy-

sis to prior restraint on speech); *Roberts v. Madigan,* 921 F.2d 1047, 1056 n. 10 (10th Cir.1990) (not applying forum analysis because school asserted constitutional justification for speech restriction); *with Walz* (applying forum analysis to viewpoint-neutral policy that limited school-sponsored speech based on subject-matter).

733. *See also id., citing Keyishian v. Bd. of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the 'marketplace of ideas.'") (citations omitted); *Burch v. Barker,* 861 F.2d 1149, 1159 (9th Cir.1988) ("Interstudent communication does not interfere with what the school teaches; it enriches the school environment for the students."); *Slotterback,* 766 F.Supp. at 293–94 (restrictions limiting the permissible subjects of students' personal intercommunication "stunt the growth of budding citizens and budding minds"); *Rivera,* 721 F.Supp. at 1194 ("[T]he mission of public education is preparation for citizenship. High school students ... must develop the ability to understand and comment on the society in which they live and to develop their own sets of values and beliefs."). Thus, the school's interest and the plaintiffs' interests are one in the same; to balance the same interests against each other would be an utterly meaningless exercise. Therefore, forum analysis is inappropriate here. School-age children are compelled by law to attend school, *see* Mass. Gen. Laws ch. 76, § 1, but while there lawfully, they enjoy the right to free personal intercommunication with other students, so long as their communication does not substantially or materially disrupt the operation of the classroom or impinge upon the rights of others, *see Tinker,* 393 U.S. at 513, 89 S.Ct. 733.

Accordingly, any school policy which infringes upon a students' protected speech by failing to adhere to these principles must, therefore, survive strict scrutiny.

### iv. *Strict Scrutiny*

■ "If there is a bedrock principle underlying the First Amendment, it is that government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victim's Bd.,* 502 U.S. 105, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). "[C]ontent discrimination raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 387, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (internal quotations omitted). To avoid this specter of intellectual oppression, this Court presumes content-based policies to be invalid. *See id.* at 382, 112 S.Ct. 2538. Consequently, to survive strict scrutiny, the school must show that its speech policies are narrowly tailored to meet a compelling state interest. *See Consolidated Edison Co. v. Public. Serv. Comm'n,* 447 U.S. 530, 540, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980). This is a showing which the school cannot make.

The only interests that the school advances as justification for its policy which permit only "responsible speech" are 1) that other students have the right to be free from "offensive" material, and 2) that the school wishes to avoid violating the Establishment Clause and any liability for doing so. *See Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (complying with the Constitution is a compelling interest). As to the first reason, the school's "undifferentiated fear or apprehension of disturbance" is precisely what the Supreme Court held "is not enough to overcome the right to freedom of expression." *Tinker,* 393 U.S. at 508, 89 S.Ct. 733. As to the second reason, the Court already addressed the matter and concluded that the school does not violate the Establishment Clause by permitting students to engage in private, school-tolerated speech. Thus, the speech policies fail strict scrutiny.

The Court need not consider whether the Distribution Policy Regarding Literature Unrelated to Curriculum is constitutionally justified, as the school neither offers nor is likely to find a justification for such an all-encompassing policy. *See Tinker,* 393 U.S. at 512–13, 89 S.Ct. 733.

Accordingly, the plaintiffs have demonstrated that they are substantially likely to prevail on their claim that the school's speech policies are facially unconstitutional subject-matter-based restrictions.

### e. *Prior Restraint on Speech*

 The plaintiffs also contend that the policies are impermissible prior restraints on speech. For present purposes, the term "prior restraint" is used "to describe administrative orders ... *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993) (*quoting* M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4–14 (1984)) (emphasis in original). The plaintiffs maintain, and the Court agrees, that the school's policies are prior restraints on speech. The speech policies require students to obtain the permission of an administrator or an administrator's designee before distributing literature on school grounds; the Distribution Policy Regarding Literature Unrelated to Curriculum prevents the distribution of any literature unrelated to school activities or school curriculum without the prior approval of school officials. There can be no question that these policies constitute prior restraints on speech. *See Riseman,* 439 F.2d 148 (finding school policy prohibiting

distribution of any literature without prior administrative approval to be an unconstitutional prior restraint on speech).

As any system of prior restraint, these policies bear a "heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Ample justification exists for this presumption against constitutional validity. As one commentator explains,

> A system of prior restraint is in many ways more inhibiting than a system of subsequent punishment: It is likely to bring under government scrutiny a far wider range of expression; it shuts off communication before it takes place; suppression by stroke of the pen is more likely to be applied than suppression through a criminal process; the procedures do not require attention to the safeguards of the criminal process; the system allows less opportunity for public appraisal and criticism; the dynamics of the system drive toward excesses, as the history of censorship shows.

Emerson, The System of Freedom of Expression 506 (1970), *quoted in Burch,* 861 F.2d at 1155. As one court has poignantly declared, "letting students write first and be judged later is far less inhibiting than vice versa." *Baughman v. Freienmuth,* 478 F.2d 1345, 1350 (4th Cir.1973).

To limit the stifling of free expression, school policies acting as prior restraints on private speech must comport with constitutional limitations, *see Tinker,* 393 U.S. at 509, 89 S.Ct. 733, and must contain procedural safeguards in an "effort to minimize the adverse effect of prior restraint,"[23] *Riseman,* 439 F.2d at 149–50. *See also*

---

**23.** While the Court recognizes the practical problems of requiring school policies to adhere to these constitutional safeguards, *see Quarterman,* 453 F.2d at 60, courts have routinely struck down school policies failing to meet the bare minimum requirements. *See, e.g., id.; Riseman,* 439 F.2d at 149–50 (*citing Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)).

*Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (requiring "narrow, objective, and definite" criteria to guide the hands of licensor); *Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (outlining procedural safeguards).

### i. *Substantive Limitations*

■ A prior restraint policy affecting private speech must comport with *Tinker,* 393 U.S. at 509, 89 S.Ct. 733. Thus, a school may exercise prior restraint upon a student's private literature "distributed on school premises on school hours in those special circumstances where [the school] can reasonably forecast substantial disruption of or material interference with school activities on account of the distribution of such printed material." *Quarterman,* 453 F.2d at 58–59 (also noting that the school need not wait until such disruption or interference actually occurs).

### ii. *Procedural Safeguards*

■ Three procedural safeguards are appropriate in this case.[24] First, a school policy "requiring prior submission of material for approval *before* distribution must contain *narrow, objective, and reasonable standards* by which the material will be judged." *Quarterman,* 453 F.2d at 59 (emphasis added). *See also Forsyth Cty.* 505 U.S. at 131, 112 S.Ct. 2395; *Baughman,* 478 F.2d at 1349 (a school policy "imposing a prior restraint must be much more precise than a [school policy] impos-

ing post-publication sanctions"). This requirement harnesses unbridled administrator discretion, *see Forsyth Cty.* 505 U.S. at 133, 112 S.Ct. 2395, by preventing an administrator from "judg[ing] the material on an *ad hoc* and subjective basis," *Baughman,* 478 F.2d at 1349. Yet the policies must guide the hands of administrators and students alike: The policies must be drawn sufficiently precise as to be meaningful to the students to whom the policy applies.[25] *See id.* at 1350–51 (finding legal terms of art such as "obscene" or "libelous" are insufficiently precise as to be understood by high school students and striking down school policy as being overbroad).

■ Likewise, policies acting as prior restraints on speech must contain a reasonably short time limit within which the administrator must either grant or deny the students' request to distribute literature. *See Baughman,* 478 F.2d at 1348. The Supreme Court has explained in analogous contexts that "[w]here the licensor has unlimited time within which to issue the license, the risk of arbitrary suppression is as great as the provision of unbridled discretion. A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 226–27, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). These concerns apply equally in the school environment, *see Baughman,* 478 F.2d at 1348–49 (refusing to specify what constitutes a reasonable time limit, but caution-

---

24. Indeed, if the Court had found the LIFE Club's distribution activities to be school-sponsored, then these requirements for precise policies would be inapplicable. *See Hazelwood,* 484 U.S. at 273 n. 6, 108 S.Ct. 562 ("We reject respondents' suggestion that school officials be permitted to exercise prepublication control over school-sponsored publications only pursuant to specific regula-

tions. To require such regulations in the context of a curricular activity could unduly constrain the ability of educators to educate.").

25. Precision also avoids unconstitutional vagueness, *see Baughman,* 478 F.2d at 1349, an issue this Court will examine in Part IV. B.1.f.

ing that a school policy "may not lawfully be used to choke off spontaneous expression in reaction to events of great public importance and impact"), and especially in light of the facts in this case. To wit, the plaintiffs wished for a final decision so that they could pass out the candy canes before the start of Winter Break; a final decision rendered after Winter Break would have defeated the whole purpose behind distributing the candy canes with their time-sensitive religious message. While school administrators hold enormous and time-consuming responsibilities, grave constitutional dangers lurk when a school administrator avoids taking the time to decide these hard questions properly and to inform those students awaiting a final decision in a timely manner. *Cf. Rivera,* 721 F.Supp. at 1194 (a school "cannot completely muzzle the students to save itself the difficulty of determining which speech it may constitutionally proscribe").

■ Lastly, the plaintiffs also urge the Court to require a procedure for prompt judicial review when the school denies permission to distribute literature. *See Freedman,* 380 U.S. at 58–60, 85 S.Ct. 734. While such a judicial review requirement is proper in, *inter alia,* municipal licensing schemes unrelated to the school context, *see id.* (requiring state film censor to issue a license to show film or to "go to court to restrain showing the film"), when considering the "special characteristics of the school environment," *Tinker,* 393 U.S. at 506, 89 S.Ct. 733, the Court is unprepared to require school administrators to run to the courthouse each and every time the school wishes to enjoin a student from engaging in certain speech or to suspend a student for violating the school's free speech policies. For present purposes, it is enough to require that school speech policies include "an expeditious review procedure" of the school administrator's deci-

sion. *Quarterman,* 453 F.2d at 59; *see also Baughman,* 478 F.2d at 1348–49. Such administrative decisions are made with the understanding that "school officials are not the final arbiters of their authority, nor do they have limitless discretion to apply their own notions" of what constitutes protected free speech. *Thomas v. Bd. of Educ. Granville Cen. Sch. Dist.,* 607 F.2d 1043, 1057 (2d Cir.1979) (Newman, J., concurring).

### iii. *The Speech Policies*

The specific speech policies involved in this case constitute prior restraints on speech that lack the appropriate safeguards minimizing the effects of prior restraint.

The Free Speech Policy admirably attempts to prescribe a reasonable time, place, and manner restriction by permitting speech "so as not to stop other people from entering class, distributing literature during classes, or hold a demonstration, so that it interferes with classes or homerooms in session." Aside from its grammatical instability, this statement contains specific, illustrative criteria that a high school student would reasonably understand and that comports with the substantive limitations of speech suppression announced in *Tinker,* 393 U.S. at 509, 89 S.Ct. 733. *See Quarterman,* 453 F.2d at 58–59 (permitting prior restraint where school reasonably forecasts substantial disruption of, or material interference with, school activities).

Problems begin to surface, however, in murky waters of the Free Speech Policy, which allows only "responsible speech," a phrase which remains undefined. The Distribution Policy prohibits the circulation of printed matter "without proper authority" of an administrator or the administrator's designee. The Distribution Policy Regarding Literature Unrelated to

Curriculum bans the distribution of all non-curriculum related literature absent approval without indicating what constitutes curriculum-related and curriculum-unrelated literature.

In short, nothing harnesses an administrator's discretion to situations in which he or she "can reasonably forecast substantial disruption of or material interference with school activities on account of the distribution of such printed material." *Quarterman*, 453 F.2d at 58–59. None of these policies contain criteria to guide the administrator's hand. No time limits exist in the school's Due Process Policy or elsewhere, limiting the time in which an administrator must render a final decision. Although the Due Process Policy provides students certain rights in "situations involving discipline or other consequential action," no specific mechanisms exist that explicitly dealing with situations involving free speech rights. It is unlikely that a fourteen year old freshman who asks the principal of Westfield High permission to distribute literature and is refused will know exactly to whom to turn next.

Accordingly, the plaintiffs have demonstrated that they are likely to succeed on their claim that the school's policies are facially unconstitutional prior restraints on speech.

### f. *Vagueness*

■ Lastly, the plaintiffs argue that the Free Speech Policy is unconstitutionally vague. They maintain that the words "responsible speech" are nowhere defined and the Free Speech Policy "either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally*, 269 U.S. at 391, 46 S.Ct. 126. The vagueness doctrine ensures that "all be informed as to what the state commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

Here, it is unlikely that the reasonable Westfield High School student understands what "responsible speech" is. Turning to the dictionary would only compound a student's confusion, since the word "responsible" means "having good judgment and the ability to act correctly and make decisions on your own." Cambridge Dictionaries Online, http://dictionary.cambridge.org/ (last modified Mar. 13, 2003). The phrase itself reserves a measure of judgment and discretion to whatever school administrator a student happens to turn for advice on the matter. A substantial risk of the suppression ideas arises whenever a school policy vests the right to suppress free speech in the discretion of one individual. *See Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Thus, the plaintiffs are substantially likely to succeed on their claim that the Free Speech Policy is unconstitutionally vague. *See Riseman*, 439 F.2d at 149; *Baughman*, 478 F.2d at 1349.

As the plaintiffs are likely to succeed on the merits of most of their claims, the Court must turn to the other factors relevant to considering whether to grant a preliminary injunction.

### 2. *The Possibility of Irreparable Harm*

■ To obtain a preliminary injunction, the plaintiffs must demonstrate that they face a significant potential of suffering irreparable harm in the absence of immediate relief. *See McGuire*, 260 F.3d at 42. "Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." *Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency*, 649 F.2d 71, 74 (1st Cir.1981).

The defendants argue that, because the plaintiffs distributed the candy canes and because their suspensions are stayed, the plaintiffs have suffered only a speculative, unreal harm. As already discussed, however, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373, 96 S.Ct. 2673. Thus, the plaintiffs have clearly satisfied this prong.

### 3. *The Ebb and Flow of Possible Hardships*

To obtain a preliminary injunction, the plaintiffs must demonstrate that the "the ebb and flow of possible hardships" favors them. *McGuire*, 260 F.3d at 42. In other words, the plaintiffs must show that issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs. *See id.*

The defendants contend that the balance of hardships tilts in their favor, but the Court finds otherwise. The defendants have not shown there to be any disruption caused as a result of the Club's candy cane distribution. Furthermore, the school cannot assert any pedagogical interest in restricting private speech, which has its own, distinct educational value. *See Tinker*, 393 U.S. at 512, 89 S.Ct. 733. The Court has already found that the school has initially failed to raise any legitimate Establishment Clause concerns. Lastly, the school will suffer no hardship in abiding by state law and the Constitution.

On the other hand, the plaintiffs have shown the school to have violated their rights to free speech. Additionally, suspensions hang ominously over the students heads; were Superintendent McDowell ever to impose them, the suspensions would surely tarnish the records of these otherwise fine students. Clearly, the balance of hardships weighs in their favor.

### 4. *The Public Interest*

Lastly, to obtain a preliminary injunction, the plaintiffs must demonstrate that issuing an injunction "will promote (or, at least, not denigrate) the public interest." *McGuire*, 260 F.3d at 42. Protecting rights to free speech is *ipso facto* in the interest of the general public. *Machesky v. Bizzell*, 414 F.2d 283, 289 (5th Cir.1969) ("First Amendment rights are not private rights ... so much as they are rights of the general public.").

Accordingly, the plaintiffs have satisfied the necessary steps for attaining a preliminary injunction, *see McGuire*, 260 F.3d at 42, and the Court will grant the plaintiffs immediate relief.

### 5. *Security Bond*

 Before issuing a preliminary injunction in favor of the plaintiffs, the Court must determine the amount of the security bond that the plaintiffs must post to cover costs and damages in case the defendants are wrongfully enjoined. *See* Fed.R.Civ.P. 65(c); *Northeast Airlines, Inc. v. Nationwide Charters & Conventions, Inc.*, 413 F.2d 335, (1st Cir.1969). Determining the necessity of posting security and the amount thereof is within the sound discretion of the Court. *See, e.g., Pharm. Soc'y of State of N.Y., Inc. v. N.Y. State Dep't. of Soc. Servs.*, 50 F.3d 1168, 1174–75 (2d Cir. 1995); *Yes for Life Political Action Committee v. Webster*, 74 F.Supp.2d 37 (D.Me. 1999) (waiving security bond). The plaintiffs have moved the Court to waive the security bond requirement. *See* Plaintiffs' Mem. in Supp. of Mot. to Waive Posting Security (Doc. No. 9).

 Here, the plaintiff parents have all submitted affidavits indicating their financial inability to post a security bond. *See id.*, Exhibits A–D (Plaintiff Parents' Affs.).

The defendants have not indicated, nor does the Court find, any harm, financial or otherwise, that may result in case the preliminary injunction is later vacated. Lastly, the First Circuit has recognized an exception to the security bond requirement in Fed.R.Civ.P. 65(c) in "suits to enforce important federal rights or public interests." *Crowley v. Local No. 82, Furniture & Piano Moving*, 679 F.2d 978, 1000 (1st Cir.1982), *rev'd on other grounds*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984) (internal quotations omitted). Here, the Court believes that the public interest is served when public high school students seek to preserve their rights to free expression and free exercise of religion. In addition, requiring a security bond in this case might deter others from exercising their constitutional rights. *See Smith v. Bd. of Election Com'rs for City of Chicago*, 591 F.Supp. 70 (N.D.Ill.1984).

Accordingly, the Court will grant the plaintiffs' motion for waiver of the security bond requirement.

## V. CONCLUSION

In conclusion, this case concerns the rights of public high school students to personally express themselves during non-instructional time on school grounds during the school day. *See Hazelwood*, 484 U.S. at 271, 108 S.Ct. 562; *Tinker*, 393 U.S. at 509, 89 S.Ct. 733. The Court's decision today leaves schools free to design their own curriculum and in no way undermines the "oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood*, 484 U.S. at 273, 108 S.Ct. 562.

For the reasons mentioned above, the Court GRANTS the plaintiffs' motion for preliminary injunction (Doc. No. 6) and motion for waiver of security bond (Doc.

No. 8) and PRELIMINARILY ENJOINS the defendants, their employees and agents, and all persons in active concert or participation with the defendants, from:

(1) Enforcing the policies entitled "Freedom of Speech, Assembly or Congregation" and "Posting of Information and Distribution of Materials" in the Student Handbook and the policy regarding non-curriculum related literature in Superintendent McDowell's letter to Plaintiffs' Counsel against the plaintiffs until such time that the policies are revised in a manner consistent with this Memorandum and Order;

(2) Enforcing any punishment upon any of the student plaintiffs for their actions in distributing the candy canes with religious messages;

(3) Imposing a prior restraint upon the right of the student plaintiffs and the Club to distribute literature to fellow students during non-instructional time without first complying with the substantive and procedural safeguards outlined in this Memorandum and Order;

(4) Prohibiting the student plaintiffs and the Club from distributing literature to fellow students during non-instructional time based on the content of the literature unless the school reasonably forecasts that the distribution will substantially disrupt or materially interfere with the operation of the school;

(5) Punishing the student plaintiffs in any way for distributing literature to fellow students during non-instructional time where such distribution does not substantially disrupt or materially interfere with the operation of the school;

(6) Otherwise infringing upon the plaintiffs' statutory and Constitutional rights.

It is So Ordered.